E-FILED
Friday, 14 September, 2012  04:30:51 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
AT ROCK ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Criminal No. 11-40027 |
| | ) |
| RAMON LEOBARDO CELAYA, | ) |
| | ) |
| Defendant. | ) |

**GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

COMES NOW the United States of America, by and through the undersigned Assistant United States Attorney, and hereby responds to defendant Celaya's Motion To Suppress Statements. The defendant claims that certain statements he made to police were a product of an illegal arrest, and were involuntary and in violation of the Fifth Amendment. The defendant's claims find support in neither the facts nor the law, therefore the defendant's motion to suppress should be denied.

**I.    FACTUAL BACKGROUND**

On Sunday, September 26, 2010, Illinois State Police Sergeant Thulen was parked in the median on Interstate 80 near the Geneseo, Illinois, exit when he saw a Nissan Maxima with New York license plates heading westbound and being driven by the defendant. Thulen estimated that the vehicle was traveling at approximately the speed limit, but noted that it slowed down significantly when the driver appeared to notice Thulen's squad car. The defendant's vehicle then immediately exited the highway at the next exit for Geneseo, drove to a Subway restaurant, and parked.

After allowing the vehicle to pass and exit the highway, Thulen pulled out from the median, also exited, and drove to the Subway parked lot. Thulen did not activate his emergency lights or otherwise attempt to conduct a traffic stop. Instead, he pulled into the parking lot, observed the defendant and his passenger getting out of their car and walking into the restaurant. At approximately 9:30 a.m., Thulen parked his squad car so as not to block in the defendant's car, greeted the defendant and his passenger, and asked them if they would mind talking to him, telling them that they did not have to. They agreed.

Thulen asked the defendant if the car belonged to him, and the defendant told him he had borrowed it to visit his grandmother in Omaha. Thulen asked the defendant who the owner of the vehicle was, and the defendant correctly identified the registered owner. Thulen then asked if he could see the defendant's license, and the defendant presented an Arizona ID card identifying him as Ramon Celaya. Thulen immediately handed the card back. Thulen asked the defendant if he still lived in Tucson, and the defendant said he had recently moved to New York, but claimed he could not remember his address.

Thulen asked the passenger whether he had any identification and if Thulen could look at it. The passenger produced a Mexican consular identification card bearing the name Jesus Armenta-Estrella and listing an address in Glendale, Arizona. Thulen immediately handed the card back, and asked the passenger if he still lived in Glendale, and he said he did.

Thulen asked the defendant if he was related to the passenger, and the defendant said no, that they were friends. Thulen asked how long they had been friends, and the defendant said "a long time." Thulen asked the defendant what his friend's name was, and the defendant replied "Jesus." When Thulen asked the defendant what his friend's last name was, the defendant did

not answer. Instead, he immediately looked to the passenger and said something in Spanish. The passenger responded by stating his last name, which the defendant then repeated back to Thulen.

Thulen asked if he could see the keys to the defendant's car, and the defendant responded by pulling out a single ignition key on a key ring which had no other keys on it. Thulen knew from his training and experience that drug couriers often receive a single vehicle key for the load vehicle they are to drive cross-country.

Thulen then asked the defendant if he knew his grandmother's address. The defendant appeared nervous, and told Thulen he did not know the address, but knew it was "by the zoo." The defendant told Thulen he had never been there before, but he knew he could find it if he found the zoo.

Thulen asked the defendant if there was anything illegal in the car, and the defendant said no. Thulen asked the defendant if he would mind opening the trunk, and the defendant agreed. Inside the trunk was a large black suitcase, which the defendant identified as his, and a smaller black suitcase, which the passenger identified as his. At around this time, a second trooper, Trooper McFall, arrived; McFall also parked his squad away from the defendant's vehicle in a location that did not block the defendant's ability to pull out of his parking spot.

Thulen then asked the defendant a series of questions about whether there were any illegal drugs in the car. In response to Thulen's separate questions about whether there was marijuana, cocaine, heroin, or methamphetamine in the car, the defendant clearly stated "no" in response to each question while maintaining eye contact with Thulen. But when Thulen asked the defendant if there were any large amounts of money in the car, the defendant shook his head

no while looking away from Thulen.  Thulen said "So there is definitely no large amounts of money in the car that belong to you?"  The defendant initially said nothing, but after a long pause, said "no."  Thulen said "Sir, you don't seem very sure about that," and the defendant simply shook his head.

Thulen asked the defendant for permission to search his car, and the defendant said "yes."  Thulen told the defendant that he wanted to search the car "front to back, top to bottom, everything in between," and the defendant said "go ahead."  Thulen asked the passenger if that was okay with him, and he agreed.  Thulen then told the defendant "You know you don't have to let us search?"  The defendant said he understood, then asked if they could go into the Subway to eat.  Thulen told them they were free to do anything they wanted and were free to go at any time.  The defendant and his passenger went into the restaurant, and Thulen and McFall began searching the defendant's car.

Trooper McFall first ran his drug sniffing dog around the car, but the dog did not alert.  Then the troopers, including a third trooper, Trooper Strouss, who arrived around the time of the canine sniff, began a manual search of the car.  Inside the large suitcase the defendant had earlier identified as belonging to him, the troopers found two large vacuum sealed Foodsaver-type bags filled with United States Currency.  The troopers also found two more similar bags of cash in the smaller suitcase the passenger identified as his.  The currency was rubber banded together, bundled, and sealed in a manner that Thulen knew from his training and experience to be consistent with the transport of drug trafficking proceeds.  One of the packages also had what appeared to be a handwritten drug ledger sealed inside with the money, which Thulen also knew to be a method used by drug traffickers.

The troopers went into the Subway and requested that the defendant and his passenger step outside. Once they were outside, the troopers handcuffed them and placed them in the back of separate squad cars. At approximately 9:40 a.m., Thulen read the defendant his *Miranda* rights, and Trooper Strauss read the passenger his *Miranda* rights. Both subjects then read back the *Miranda* warning to the officers from a Spanish language *Miranda* card.

The defendant told Thulen that there was approximately $40,000 cash in the large suitcase. He claimed that the money belonged to him, and that he had earned the money buying and selling cars. He told Thulen that the money had never been in the bank, and that he was completely unaware of any other currency in the car.

The passenger told Thulen that the only money he had was the money in his pocket, and that he knew nothing about the heat-sealed bags of money found in his suitcase.

Both the defendant and the passenger were transported to the nearby Geneseo Police Department, where the officers waited for state police investigators to arrive. While waiting, Thulen examined the contents of the defendant's wallet and discovered an insurance card for the vehicle that had been issued on September 17, 2010, only nine days prior to the traffic stop.

At approximately 1:42 p.m., Illinois State Police Special Agent John Clark and Inspector Alex Chavira again advised the defendant of his *Miranda* rights, this time via a written Illinois State Police *Miranda* waiver form. The agents provided the defendant with the form, read each right aloud to him, asked him if he understood each right, and had the defendant initial next to each right if he did. The defendant did so, signed the waiver form, and agreed to speak to agents.

The defendant initially repeated the story about the money being from car sales, but then admitted that story was a lie. Among other things, the defendant told investigators that in fact he

had been transporting marijuana and money back and forth from New York to Arizona, and that this was the third time he had made such a trip. The defendant told investigators that the cash the troopers found in his car was payment for a 120 pound load of marijuana the defendant previously had transported to New York.

After the interview, agents learned that approximately four months earlier, on May 29, 2010, the defendant had been stopped by police in Alamosa, Colorado, and was found to be transporting approximately $61,960 in cash contained in Ziploc and vacuum-sealed bags.

Meanwhile, Thulen and McFall took the bags of money back to state police headquarters to be logged into evidence. McFall's dog conducted a dog sniff of the money, and the dog alerted to the odor of narcotics.

The defendant was ultimately charged in this case with conspiracy to distribute and possess with intent to distribute marijuana.

## II.     ARGUMENT

The defendant challenges as involuntary his confession to police and claims that the statements were obtained in violation of the Fifth Amendment, alleging that they were the product of an "illegal arrest." Defendant's claim is baseless. Based on the facts Sergeant Thulen gathered during his consensual encounter with the defendant and his passenger, viewed through the lens of Thulen's extensive highway drug interdiction training and experience, he had probable cause (or at the very least, reasonable suspicion) to believe the defendant was engaged in drug trafficking and money laundering, and specifically, transporting drug trafficking proceeds.

### A. Legal Framework

#### 1. Consensual Encounters

Not every encounter between citizens and police involves a seizure that implicates the Fourth Amendment: "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *United States v. Childs*, 277 F.3d 947, 950 (7th Cir. 2002) (en banc) (*quoting Florida v. Bostick*, 501 U.S. 429, 434 (1991)); *United States v. Broomfield*, 2005 WL 1791307 at *2 (7th Cir. July 29, 2005). "[T]he law is well established that if an officer asks rather than commands, the person accosted is not seized, and so the protections of the Fourth Amendment do not attach." *United States v. Stribling*, 94 F.3d 321, 323-24 (7th Cir. 1996).

#### 2. Probable Cause

Probable case to make an arrest exists when the police possess reasonably trustworthy knowledge of facts and circumstances that would warrant a reasonable man to believe that a suspect had committed or was committing a crime. *Beck v. Ohio*, 379 U.S. 89 (1964); *United States v. Scheets*, 188 F.3d 829, 839 (7th Cir. 1999). There is no requirement that the officer's belief be correct or more likely true than not, only that it be reasonable. *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999). Courts look to the totality of the circumstances to determine whether police could have reasonably believed that a particular individual has committed a crime. *United States v. Navarro*, 90 F.3d 1245, 1254 (7th Cir. 1996).

Probable cause does not require evidence sufficient to support a conviction, however there must be a probability or substantial chance of criminal activity on the suspect's part.

*United States v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000); *see also Navarro* at 1253 (probable cause requires a probability or substantial chance of criminal activity, though not an actual showing of criminal activity); *United States v. Funches*, 327 F.3d 582, 586-87 (7th Cir. 2003) (probable cause does not require evidence sufficient to satisfy a reasonable doubt or even a preponderance standard). In making probable cause determinations, law enforcement officers are entitled to draw reasonable inferences from the facts before them, based on their training and experience. *Ornelas v. United States*, 517 U.S. 690, 699-700 (1996); *Funches*, at 586. The mere existence of possible innocent explanations does not necessarily negate the existence of probable cause. *Funches* at 587.

### 3. Reasonable Suspicion

The standard of reasonable suspicion is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," instead, it requires only "a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). When making reasonable suspicion determinations, the Supreme Court has repeatedly stated that courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002)(*quoting United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). Reasonable suspicion is a "commonsense, nontechnical concept that deals with the factual and practical considerations of 'everyday life on which reasonable and prudent [people], not legal technicians, act.'" *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006) (*quoting Ornelas v. United States*, 517 U.S. 690, 695 (1996)).

As with probable cause determinations, though reasonable suspicion is an objective standard, the court must consider the training and experience of the individual officers involved, as the reasonable suspicion standard allows officers "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu* at 273. "Though each factor giving rise to suspicion might appear to be innocent when viewed alone, a combination of factors may warrant further investigation when viewed together." *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002) (citations omitted); *see also Arvizu* at 274 (reasonable suspicion to be determined based on the totality of all circumstances, not a "divide-and-conquer analysis" that considers each factor in isolation); *United States v. Sokolow*, 490 U.S. 1, 9 (1989)(each factor standing alone insufficient, but "taken together they amount to reasonable suspicion").

### 4. Voluntariness of Confessions

"A confession is voluntary if, in the totality of the circumstances, it is 'the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001) (*quoting United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998)). In order to exclude a confession as involuntary, a court must find, in view of the totality of circumstances, that law enforcement officials have overborne the will of the accused. *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963); *Townsend v. Sain*, 372 U.S. 293, 307 (1963). The necessary factual inquiry centers on (1) the conduct of law enforcement officials in creating pressure and (2) the defendant's capacity to resist that pressure. *See Mincey v. Arizona*, 437 U.S. 385, 399-401 (1978). In fact, police coercion is a necessary predicate to a

finding that a confession is involuntary within the meaning of the Due Process Clause; without police coercion that is casually related to the confession, there cannot be a constitutional violation. *Colorado v. Connelly*, 479 U.S. 157, 170 (1986); *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001). Because coercion by a state actor is a necessary element in satisfying this test, "very few incriminating statements, custodial or otherwise, are held to be involuntary." *United States v. Rutledge*, 900 F.2d 1127, 1129 (7th Cir. 1990).

   **B. Analysis**

In this case, the initial encounter between Sergeant Thulen and the defendant began as a consensual encounter conversation in the Subway parking lot. During that encounter, Thulen discovered a number of suspicious factors that, when considered together, reasonably led Thulen, a highly trained and experienced highway drug interdiction officer, to conclude that the defendant was engaged in drug trafficking and money laundering. Those factors included:

   1. The defendant and his passenger were engaged in cross-country travel.

   2. The identification documents of both the defendant and his passenger identified them as being from Arizona, a drug source state.

   3. The defendant told Thulen he had recently moved from Arizona to New York, but he claimed he did not know his address.

   4. The registered owner of the vehicle was neither the defendant nor the passenger, but rather a third party, who supposedly loaned the vehicle to the defendant for a cross-country drive from New York to Omaha.

   5. The defendant professed to be long-time friends with his passenger, but he did not know his last name.

6.  The defendant had only a single key ignition to the vehicle, which Thulen knew to be consistent with other drug couriers, who are often supplied vehicles by third parties and given only a single vehicle key.

7.  The defendant's indefinite travel plan – driving to an unknown location in Omaha – was consistent with those of drug couriers, who as a security measure are often given only a destination city, but not an exact location, by their handlers.

8.  The defendant was unusually nervous, especially when discussing supposedly benign travel plans to visit his grandmother in Omaha.

9.  The defendant's markedly different reaction to Thulen's questions about whether he had illegal drugs in the car and whether he had any large amounts of money.

10.  The defendant lied about whether there were large amounts of money in the car.

11.  The cash was heat-sealed and packaged in a manner consistent with that used by drug traffickers, who heat seal money and drugs in attempt to prevent drug-detecting dogs from alerting on them and couriers from skimming money or drugs from the load.

12.  Sealed within one of the packages was a drug ledger consistent with that Thulen knew to be used by drug traffickers.

After the defendant and his passenger were detained and *Mirandized*, they provided further information to Thulen, but rather than allay Thulen's suspicions, the additional information only served to heighten them.  During those interviews, Thulen learned:

13.  Although the defendant eventually claimed the $40,000 belonged to him, both the defendant and his passenger continued to deny ownership of the vacuum sealed cash from the smaller suitcase, in spite of the fact that it was packaged identically to the other money.

14. The defendant's story that the cash came from car sales did not make sense, and did not explain why the money would be vacuum sealed so as to avoid detection by a drug dog.

Finally, after transporting the defendant to the Geneseo Police Department, Thulen reviewed the contents of his wallet and discovered:

15. The proof of insurance certificate found in the defendant's wallet indicated that it had been issued only nine days earlier, which is consistent with drug trafficker practices of buying load cars shortly before they are to be used for drug trips.

The totality of these circumstances, when viewed through the lens of Sergeant Thulen's considerable training and experience in highway drug interdiction, was more than sufficient to lead him to conclude that there was probable cause to believe the defendant was engaged in criminal activity. *See United States v. Funches*, 327 F.3d 582, 586-87 (7th Cir. 2003) (existence of possible innocent alternatives does not negate probable cause, but lack of innocent alternatives is significant; when DEA agents observed unexplained – though not obviously criminal – conduct that was consistent with a drug transaction, probable cause existed because "[t]rained narcotics officers observing the defendants' actions in this case could reasonably conclude based on their training and experience that they had witnessed a drug transaction").

In the face of the totality of these circumstances, the defendant attempts to cast doubt by engaging in the sort of "divide and conquer" analysis prohibited by *Arvizu* and its progeny and focusing instead on a single factor – the large amount of cash seized from the defendant. He cites cases involving the forfeiture of currency, such as *United States v. $506,231 in United States Currency*, 125 F.3d 442, 452 (7th Cir. 1997), for the proposition that the existence of large amounts of money, standing alone, does not establish probable cause. Def. Mot. p. 2. Those

cases are of little value here, however, because this case involves much more than the mere presence of a large amount of cash; the large amount of money the defendant possessed is but one of many factors that must comprise this Court's totality of the circumstances analysis.

When courts are faced with cases – such as this one – that involve more than simply large amounts of money, they have not hesitated to conclude that the totality of the circumstances points to criminal conduct. For instance, in *United States v. Suarez*, 225 F.3d 777 (7th Cir. 2000), the defendant was arrested for making false statements to a Customs agent and for failing to report $129,710 in currency she was attempting to transport from O'Hare Airport in Chicago to Mexico. During X-ray screening, investigators noticed a suspicious package in the defendant's luggage. A Customs inspector approached Suarez and explained that if she was taking more than $10,000 in cash out of the country, she was required to declare as much in a reporting form to Customs. Suarez told the inspector she had just sold her house, and falsely stated she was carrying only $400, signing a declaration to that effect. Suarez's luggage was subsequently inspected, and investigators found $129,710 in cash wrapped in cellophane tape and concealed in the bag.

On appeal, Suarez challenged the imposition of a two-level sentencing enhancement applied because the district court found that she "knew or believed that the funds were proceeds of, or intended to promote unlawful activity." *Suarez* at 778. In arguing that the government failed to carry its burden of proving the enhancement, Suarez relied upon cases, such as *$506,231 in United States Currency,* for the proposition that the mere existence of a large amount of unexplained cash does not establish probable cause to believe it is proceeds of illegal activity. But, the *Suarez* court rejected that argument, distinguishing *$506,231 in United States*

*Currency*: "Here, the court had not only [the defendant's] lies regarding the existence of the money, but critically had her duplicity regarding the source of the money as well. Lying about the source gives rise to an inference that the source is illegitimate. . . . A natural inference from the lie and surrounding circumstances is that the source was not lawful, and [the defendant] chose not to rebut that inference." *Suarez* at 780. *See also United States v. $107,840 in U.S. Currency*, 784 F.Supp.2d 1109, 1124-30 (S.D. Iowa 2011) (noting that mere possession of cash is alone insufficient to establish a "substantial connection" to drug activity, but that connection was made when, among other things, subject was transporting in his vehicle a large amount of small denomination bills, heat-sealed in plastic (which the court recognized as a "common ploy to mask odors such as might be detected by dog searches"), made inconsistent statements about his trip, and where drug dog alerted to the cash); *United States v. $159, 880 in U.S. Currency*, 387 F.Supp.2d 1000 (S.D. Iowa 2005) (seized money substantially related to drug trafficking where subject was carrying $159,880 bundled with rubber bands and stored in a plastic bag in the trunk, lied about the presence of money when asked by trooper, was traveling between areas known for drug activity, dog alerted to currency, subject made inconsistent statements and possessed drug records, and was unusually nervous).

Thus, this case involves much more than the mere presence of a large amount of currency. The defendant first lied about the presence of the money, then after the money was found told an implausible story to explain its presence. In addition, the money was deliberately concealed in a way used by drug traffickers to avoid detection by a drug sniffing dog, and a portion of it was unclaimed by either occupant of the car. These factors, combined with a number of other hallmarks of drug trafficking observed by Sergeant Thulen, and viewed in light

of Thulen's considerable training and experience, provided abundant probable cause to the believe the defendant was likely involved in drug trafficking and money laundering. The defendant's arrest was supported by probable cause, and his subsequent statement to police was not the product of an unlawful arrest, but was knowingly and voluntarily made. [1]

**WHEREFORE**, the government respectfully requests that defendant's Motion To Suppress Statements be denied.

>Respectfully submitted,
>
>James A. Lewis
>United States Attorney
>
>BY:  __/s/ John K. Mehochko_____
>John K. Mehochko
>Assistant United States Attorney
>1830 Second Avenue, Suite 320
>Rock Island, Illinois 61201
>Telephone (309) 793-5884

### CERTIFICATION OF SERVICE

**I HEREBY CERTIFY** that on September 14, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participant:

George F. Taseff
Counsel for Ramon Leobardo Celaya

>_/s/ John K. Mehochko_____
>John K. Mehochko
>Assistant U.S. Attorney

---

[1] Though the defendant also makes a passing allegation that his statements to Clark and Chavira were obtained in violation of *Miranda*, the facts in this case show that the defendant was advised of his *Miranda* rights at least three times, but elected to waive those rights and speak to officers.