E-FILED
Wednesday, 09 January, 2013 04:59:53 PM
Clerk, U.S. District Court, ILCD

1          UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF ILLINOIS

2

3

4  UNITED STATES OF AMERICA,     )
                                 )
5            Plaintiff,          )
                                 )  Criminal No. 4:11-40027
6       vs.                      )  Peoria, Illinois
                                 )
7  RAMON CELAYA,                 )
                                 )
8            Defendant.          )

9

                RECORD OF PROCEEDINGS
10                MOTIONS HEARING
                SEPTEMBER 19, 2012

11

                    BEFORE:
12        THE HONORABLE JAMES E. SHADID,
           United States District Judge

13

14  APPEARANCES:

15  For the Government:     JOHN K. MEHOCHKO, ESQUIRE
                            Asst. United States Attorney
16                          1830 Second Avenue
                            Rock Island, Illinois 61201
17                          (309) 793-5884

18

19  For the Defendant:      GEORGE TASEFF, ESQUIRE
                            Asst. Federal Public Defender
20                          401 Main Street, Suite 1500
                            Peoria, Illinois 61602
21                          (309) 671-7891

22

23        Jennifer E. Johnson, CSR, RMR, CRR
             U.S. District Court Reporter
24           Central District of Illinois

25  Proceedings recorded by mechanical stenography;
    transcript produced by computer

2

1                          INDEX

                                              PAGE
2

3    WITNESS FOR THE GOVERNMENT:

4       CLINT THULEN

5            Direct Examination                4
             Cross-Examination                 43
6            Redirect Examination              83
             Recross-Examination               93
7            Further Redirect Examination      95
             Further Recross-Examination       96
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings held in open court.)

2        THE COURT:  This is the case of the *United*

3    *States vs. Ramon Leobardo Celeya*.  Am I pronouncing

4    that correctly?  11-40027.  Mr. Celeya's present

5    with Mr. Taseff.  Mr. Mehochko present for the

6    government.

7        The matter is set for motion to suppress and

8    motion to dismiss today.  The government has filed

9    a response.

10       Are the parties ready to proceed?

11       MR. MEHOCHKO:  Yes, Your Honor.

12       MR. TASEFF:  Yes, Judge.

13       THE COURT:  Address the motion to suppress

14   first?

15       MR. TASEFF:  Yes.  The motion to suppress will

16   provide the factual predicate for the motion to

17   dismiss.  This is a renewal of the venue issue that

18   was raised in the *Pereira* case, Judge, and we're

19   essentially adopting the pleadings and the orders

20   in that case, to raise that in this matter as well.

21       THE COURT:  Fine.

22       MR. TASEFF:  We can address the matter in more

23   detail after the conclusion of the evidence here.

24       THE COURT:  Okay.  Parties ready to proceed?

25       MR. TASEFF:  Yes.

1       MR. MEHOCHKO:  Yes, Your Honor.

2       THE COURT:  All right.  Let's proceed.

3       MR. MEHOCHKO:  Your Honor, the United States

4    calls Sergeant Clint Thulen.

5       THE COURT:  All right.  Sergeant, do you want

6    to come forward, please?

7       **(Witness sworn by the clerk.)**

8       THE COURT:  If you need light at counsel

9    table, there is a little bit that is helpful.

10      All right.  Go ahead.

11                   **CLINT THULEN,**

12   **called as a witness, was examined and testified**

13   **upon his oath as follows:**

14                **DIRECT EXAMINATION**

15   **BY MR. MEHOCHKO:**

16   Q.  Can you please state your name, sir?

17   A.  Sergeant Clint, C-l-i-n-t, Thulen,

18   T-h-u-l-e-n.

19   Q.  And how are you employed?

20   A.  I'm a sergeant with the Illinois State Police.

21   Q.  And how long have you been employed with the

22   Illinois State Police?

23   A.  Since June of 1990.

24   Q.  And what are your duties with the state

25   police?

1   A.   Patrol functions.  I'm a patrol sergeant.

2   Q.   Do you have any specialized training or area

3   of expertise?

4   A.   Yes.

5   Q.   What is that?

6   A.   Criminal patrol, drug interdiction.

7   Q.   And could you please give the Court some idea

8   of your training in highway drug interdiction?

9   A.   I have approximately 900 to 1200 hours of

10  training related to drug interdiction, criminal

11  patrol.  I'm an instructor for the United States

12  Department of Transportation Drug Interdiction

13  Assistance Program and have been so since

14  approximately 2003, I believe.  I handled two

15  different patrol canines that were certified in

16  drug detection for approximately ten years and have

17  been on patrol approximately 22 years, I guess.

18  Q.   So, you were a dog handler.  Are you currently

19  a dog handler or no?

20  A.   I am no longer a canine handler, no.

21  Q.   Okay.  Have you received any awards in the

22  area of drug interdiction?

23  A.   Yes.

24  Q.   Can you talk about those, please?

25  A.   I was the -- I've been nominated for Illinois

1   State Police Officer of the Year numerous

2   occasions.  I was the Illinois State Police Officer

3   of the Year in 2005.  I've been nominated for

4   United States Department of Transportation Drug

5   Interdiction Assistance Program, Commercial Motor

6   Vehicle Officer of the Year on numerous occasions,

7   which is usually five nominations in the nation.

8   And I've never won the award, but been nominated

9   several times.

10  Q.   You've been one of the five nationally

11  nominated?

12  A.   It's five to seven officers.  Usually it's

13  five.

14  Q.   Okay.  And as I understand it, you're assigned

15  to District 7 right now; is that correct?

16  A.   I am.

17  Q.   You typically patrol Interstate 80?

18  A.   Yes, Henry County.

19  Q.   And does Interstate 80 have any particular

20  significance to you as a drug interdiction officer?

21  A.   Yes.

22  Q.   What is that?

23  A.   According to the -- according to the federal

24  government, I-80 in Henry County is one of five

25  main drug corridors in the U.S.  There's actually

1  two or three, depending on how you count them, that

2  come together in that area of I-80 in Henry County.

3  So, it is a -- it's an interstate highway that

4  connects the -- not only the Southwest, the West

5  Coast and the Pacific Northwest to the major drug

6  destination areas such as Chicago and the East

7  Coast.

8  Q.   Okay.  And I was going to ask you, if you

9  could just in general terms explain, based on your

10  training and experience, what the flow of commerce

11  relating to drugs is.  Is it typically a drug

12  moving west to east, vice versa?  How does that

13  work?

14  A.   Typically, with one notable exception, the

15  illegal narcotics flow from the U.S./Mexico border

16  in the Southwest or, particularly in the last few

17  years, northern California.  And for a several-year

18  period from about 2004 to 2008, there was a large

19  influx of illegal medical marijuana, PC bud coming

20  from the Pacific Northwest imported from southwest

21  Canada.  Those, those drug source areas, drugs are

22  typically transported from west to east, to the

23  major population centers -- Chicago and the East

24  Coast.  And typically the currency which is payment

25  for those large narcotics transactions flows from

8

1   east to west.

2        There is one major exception to that and

3   that's southeast Canada where there's a large

4   amount of MDMA and Ecstasy coming from that area,

5   traveling westbound, and then sometimes money

6   travels back to the western parts of Canada -- or,

7   I'm sorry, the eastern parts of Canada.

8   Q.   Now, I want to talk to you a little bit about

9   what happened on the day of the encounter here and

10  that was September 26th of 2010.  What were you

11  doing that day?

12  A.   Stationary patrol.

13  Q.   Where was that?

14  A.   I-80 in the crossover just east of Geneseo,

15  Illinois, milepost 20 approximately.

16  Q.   And were you driving a marked squad car?

17  A.   I believe at that time I had a white Ford

18  Crown Victoria squad car.  It's unmarked, but it's

19  still pretty obviously a police car.

20  Q.   So, it doesn't have the yellow state police

21  decal on the side of it, but it's fairly obvious

22  who's driving that car?

23  A.   It seems -- it seems that way, yes, sir.

24  Q.   Were you wearing a uniform?

25  A.   Yes.

1  Q.   Okay.  At some point that -- and I'm talking

2  about the morning hours here, did you encounter the

3  defendant, Ramon Celeya?

4  A.   I did.

5  Q.   Can you describe again and explain how you

6  came to encounter Mr. Celeya?

7  A.   My initial contact with Mr. Celeya in person

8  was at the Subway restaurant on Bestor Drive in

9  Geneseo, Illinois.

10  Q.   Okay.  Prior to the in-person contact, did you

11  see him while you were on the interstate conducting

12  stationary patrol?

13  A.   Yes.

14  Q.   Tell us what you saw while you were on the

15  interstate.

16  A.   I saw a silver 2000 Nissan Maxima bearing a

17  gold-and-black-colored New York registration

18  traveling westbound on I-80.  And as it approached

19  the crossover, I saw that Mr. Celeya was driving

20  the vehicle.  I saw that the vehicle was occupied

21  by another person in the front passenger seat.  And

22  I saw that vehicle drive by my location at I-80

23  westbound at milepost 20.

24  Q.   Okay.  What did the vehicle do, if anything?

25  A.   I noticed that the -- I noticed that the

vehicle appeared to be driven very carefully.  I
noticed that Mr. Celeya seemed rigid and tense as
he drove by, that he stared straight ahead, didn't
look at my squad car in the crossover.  And it just
seemed like -- I, I noticed as he drove by that he
seemed to be very careful with his driving, and I
noticed his demeanor.

Q.  Okay.  Is that -- is that unusual?  I mean, a
lot of people tend to drive a little more carefully
around the police.  Are you used to seeing that?

A.  That is correct.  People do slow down when
they see me parked in the -- parked in the median.

     The rigid appearance and not looking at the
squad car as you drive by, it's, it's a little
unusual.  It may not mean anything.  But most
people do take a glance, look at the squad car, and
they don't usually look quite so tense.

Q.  Fair enough.

     Was the defendant speeding?

A.  I didn't observe any traffic violations.

Q.  Okay.  What happened?

A.  I pulled out of the crossover after the silver
Nissan Maxima pulled past my location -- drove by
my location.  I started westbound on I-80, and I
noticed that the vehicle exited I-80 and traveled

1    down a ramp of I-80 westbound to Illinois Route 82
2    at Geneseo.
3    Q.  Now, when you say "pulled out of the
4    crossover," did you activate your emergency lights?
5    A.  I did not.
6    Q.  And did you pull in directly behind the
7    defendant, or how far behind him were you?
8    A.  No, I waited until the vehicle traveled past
9    my location some distance, and I pulled out --
10   pulled out of the crossover, intending ultimately
11   to see -- sometimes vehicles exit I-80 at Route 82
12   at Geneseo.  Sometimes they continue on westbound,
13   in which case I catch up to the vehicle and check
14   for violations.
15   Q.  When you say "continue on westbound," you mean
16   exit and then get right back on the interstate?
17   A.  Yeah, that, that could happen, too.  I mean
18   just continue past the exit generally.
19   Q.  Okay.
20   A.  Usually one of two things happens:  Usually
21   they continue westbound on I-80 past the exit or
22   they exit I-80 at Route 82.
23   Q.  Did you notice any changes in the defendant's
24   speed?  Did he speed?
25   A.  I believe that the defendant's vehicle was

1  likely at or below the speed limit.  It did seem

2  like for I-80 he was very strictly obeying the

3  traffic laws.

4  Q.  Now, after you pulled out of the crossover,

5  what happened?

6  A.  I observed that the vehicle exited I-80 at

7  Route 82, and as I myself exited I-80 at Route 82,

8  I did see that the vehicle was down at or near the

9  stop sign and was continuing northbound on

10  Route 82.

11     I exited the very same ramp, stopped at the

12  bottom of the ramp for Route 82.  I continued

13  northbound on Route 82 and located the silver

14  Nissan Maxima with the black and gold New York

15  registration parked in front of the Subway

16  restaurant on Bestor Drive in Geneseo.

17  Q.  What did you do then?

18  A.  Both subjects that had occupied the Nissan

19  Maxima had already exited the vehicle, and they

20  were walking towards the door of Subway restaurant.

21  And I -- as I drove past their vehicle, I rolled

22  down my passenger window and greeted them.

23  Q.  What specifically did you say?

24  A.  Probably something to the effect of, Hey,

25  how's it going?  How are you today?

1    Something to that effect is my pretty normal,
2  standard greeting.
3  Q.  And what did you do then?
4  A.  Mr. Celeya turned around, walked back towards
5  my vehicle, as did the other subject.  And I just
6  basically said, Hey, how are you today?  Must be
7  traveling.
8    And fairly early in this contact I asked him
9  if I could ask him a couple quick questions and
10  explained to them that they didn't have to talk
11  with me.
12  Q.  And when you did that, what was their
13  response?
14  A.  Continued talking to me.
15  Q.  They agreed to talk to you?
16  A.  Yes.
17  Q.  And just for the record, this initial contact
18  in the Subway parking lot, was that approximately
19  9:30 in the morning?
20  A.  Yes.
21  Q.  So, after the defendant and his passenger
22  agreed to talk to you, what happened next?
23  A.  I asked Mr. Celeya about the vehicle.  I
24  probably told him that I thought it was a nice
25  vehicle or something to that effect and asked him

1    if it was his vehicle.  He told me that it belonged
2    to Albert Jones.
3    Q.  Do you know whether or not that was accurate?
4    A.  Yes.
5    Q.  It was?
6    A.  Yes.  Later on I was able to look at a
7    registration card that indicated that Albert Jones
8    did, in fact, own the vehicle.
9    Q.  Did the defendant explain why he was driving
10   this vehicle that was registered to Mr. Jones?
11   A.  He said that he borrowed the vehicle to travel
12   to Omaha, Nebraska, to visit his grandmother.
13   Q.  Did you ask him -- let me ask you this:  After
14   he told you that, what did you do?
15   A.  Noting that it was a third-party vehicle --
16   well, actually I asked Mr. Celeya if I could see
17   his I.D. card -- or see a driver's license or I.D.
18   card.  He showed me an Arizona identification card
19   which I immediately returned to him.  It indicated
20   that Mr. Celeya lived in Tucson, Arizona.
21   Q.  Did you ask the defendant whether he still
22   lived in Tucson?
23   A.  I did.
24   Q.  What did he say?
25   A.  He said that he had recently moved to New York

1    City.  I asked him where at in New York City, if he

2    knew the address, and he said that he couldn't

3    remember the address.

4    Q.   Now, you mentioned earlier that you noted that

5    it was a third-party vehicle or a third-party

6    vehicle owner.  Did that have any particular

7    significance to you based on your training and

8    experience?

9    A.   Yes.  I also asked the passenger to -- I

10   determined that by asking the passenger to see his

11   identification or driver's license and noted that

12   he was not Albert Jones.  The third-party vehicle

13   did have a significance in my mind, yes.

14   Q.   And what is that?  Can you explain that?

15   A.   Third-party vehicles or incidents in which the

16   -- in which the owner of the vehicle is not present

17   is a very common commonality in criminal patrol

18   cases where large amounts of narcotics or currency

19   contraband is later located.

20   Q.   When you say "commonality," what do you mean

21   by that?  Does that mean everybody with a

22   third-party vehicle is carrying dope or money or

23   something?

24   A.   No, no.  It is -- it's part of a bigger

25   picture.  The commonalities and indicators that we

1  see in these kinds of cases are things that we try

2  to consider as a whole.  By themselves they

3  probably mean nothing, but when we start -- when we

4  start putting them together in clusters or start to

5  see clusters of these behaviors, indicators or

6  observations that are common to criminal patrol

7  type incidents, it often has significance.  And

8  third-party vehicles are something that, in my

9  training and experience, I have seen over and over

10  and over again in these kind of incidents.

11  Q.  Okay.  So, after the defendant produced his

12  identification card -- and you gave it back to him,

13  correct?

14  A.  Yes.

15  Q.  And the passenger produced an identification

16  card.  That was a Mexican consular I.D. card?

17  A.  Yes.

18  Q.  Had his name and address in Glendale, Arizona?

19  A.  That's correct.

20  Q.  Okay.  You handed that card back as well?

21  A.  I did.

22  Q.  Okay.  Then what happened?  Did you ask the

23  passenger any questions?

24  A.  The, the passenger, I, I had indications and

25  kind of gathered that he didn't speak a lot of

1    English so most of my conversation was primarily

2    with Mr. Celeya.

3    Q.   Did you ask the passenger whether he still

4    lived at that address in Arizona?

5    A.   I did, and he indicated that he did.

6    Q.   And for the record, the I.D. card that the

7    passenger provided to you bore the name Jesus

8    Armenta-Estrella; is that correct?

9    A.   That is correct.

10   Q.   Okay.  So, after you looked at the passenger's

11   I.D. card, what did you do?

12   A.   I asked -- I asked Mr. Celeya how long he had

13   known Mr. Estrella, and he indicated that they were

14   friends and had been friends for a long time.

15   Q.   What did you -- what happened after that?

16   A.   I asked him if he knew what Mr. Estrella's

17   name was, and he told me Jesus.  And I asked him if

18   he knew what his last name was; he didn't reply.

19   He looked at Mr. Estrella, said something in

20   Spanish; and Mr. Estrella, obviously, stated his,

21   his last name.  And then Mr. Celeya repeated to me

22   the name Estrella.

23   Q.   After that exchange, what did you do then?

24   A.   At some point I also asked Mr. Celeya if I

25   could see the key for the vehicle.  He removed from

1   his pocket a single key on a single key ring.

2   Q.   Why did you ask the defendant if you could see

3   the key to the vehicle?

4   A.   One of the most common things that has grown

5   to have significance with me in my experience, as

6   well as my training but particularly my experience

7   is vehicles that have one key and maybe a key ring

8   or one key stuck in the ignition; a key ring with

9   no other keys, no other key ring, fobs, items of

10  personalization that people typically have on their

11  key rings.

12  Q.   House keys, business keys?

13  A.   House keys, business keys, cards for

14  businesses that -- the, the swipe cards, the

15  discount cards for businesses, various key rings

16  that you pick up anywhere, carabiners, postal keys,

17  house keys.

18       Over and over in these criminal patrol

19  incidents, we have observed these vehicles being

20  handed off from person to person to person, and

21  typically a by-product of that is that there's no

22  items of personalization or any other keys on the

23  key ring; and it, it is somewhat telling to me.

24  And that's why I asked to see it.

25  Q.   Okay.  You said that after you noted that

there was just the single ignition key, what did
you do?

A.   I continued to speak with Mr. Celeya.
Ultimately I asked him if there was anything
illegal in the vehicle.

Q.   Did you ask him some questions about his
intended destination before that?

A.   Oh, yes, I did.  Yes, I did.  I asked him if
they were on vacation or out traveling for work,
and he told me that he and his friend Jesus, whose
last name he didn't remember, were going to Omaha
to visit Mr. Celeya's grandmother.  And I asked him
if he knew where his grandmother lived.  He told me
that she lived by the zoo, and that when he found
the zoo he would be able to find his grandmother's
house.  I asked him if he'd ever been there before,
and he -- I believe he indicated to me that he had
not ever been there, but he could find it once he
found the Omaha zoo.

Q.   What was the defendant's demeanor during this
conversation?

A.   Becoming more nervous as the contact went on.

Q.   Now, after that conversation about his
destination, what did you do?

A.   At some point I asked him if there was

1   anything illegal in the vehicle, and I asked him

2   specifically about illegal narcotics.

3   Q.   Now, when you asked him if there was anything

4   illegal, what was his response?

5   A.   He indicated there was not.

6   Q.   Now, did you ask him at some point if he would

7   mind opening the trunk?

8   A.   Yes.

9   Q.   And what was his response?

10  A.   He agreed to do that, and I believe that at

11  that point he opened the trunk.

12  Q.   And what was in the trunk?

13  A.   Numerous items.  There was a large black

14  suitcase, a small black nylon suitcase.  The large

15  black suitcase was also nylon.  There were some

16  bags that looked like they were from designer

17  stores.  And that's all I -- that's all I recall at

18  this time.

19  Q.   Did you ask the defendant's passenger which

20  suitcase belonged to which?

21  A.   I did.

22  Q.   And the defendant identified the large one as

23  his; is that correct?

24  A.   Yes.  And Mr. Estrella indicated that the

25  smaller of the two -- I would say the medium-sized

1   black nylon suitcase belonged to him.

2   Q.   What happened after that?

3   A.   I at some point asked if there was any

4   marijuana, methamphetamine individually and

5   received a response from each.

6   Q.   Specifically I want to ask you how you

7   conducted those questions.  What specifically did

8   you say, and how did you do it?

9   A.   Okay.  What I did is I asked, as is my habit

10  -- the order varies, but I believe that I asked

11  initially if there was marijuana in the vehicle;

12  Mr. Celeya looked me in the eye and said no.  I

13  asked him if there was cocaine in the vehicle; he

14  looked me in the eye and said no.  I asked him if

15  there was methamphetamine in the vehicle; he looked

16  me in the eye, said no.  I asked him if there was

17  heroin in the car; he looked me in the eye and said

18  no.

19      Then asked him if there were any large amounts

20  of currency in the vehicle; and he immediately

21  broke eye contact, and his response was not an

22  immediate no.  And he did not seem very convinced

23  of his answer.  He indicated -- and I don't

24  remember exactly how, but he did indicate in the

25  negative, that there wasn't a large amount of

1  currency in the vehicle.  But then I asked him, Are

2  you sure about that?  And at that time he said no,

3  but he wasn't very convincing in that answer.

4      The other answers were convincing.  He looked

5  me in the eye and said no.  So --

6  Q.  Now, as I understand it, at some point during

7  this encounter Trooper McFall arrived as well?

8  A.  Yes.

9  Q.  Okay.  And is that because you had sent a

10  message to him that you had a contact at Subway?

11  A.  Yes.

12  Q.  Okay.  And when McFall arrived, where did he

13  park his squad car?

14  A.  I believe that he parked -- the Subway

15  restaurant and the Culver's restaurant are adjacent

16  to each other, and there's a Culver's parking lot

17  that butts up against the Subway parking lot.  I

18  believe that he parked on the other side.

19      But I know that he didn't -- one of the

20  important things in this kind of contact is he

21  didn't block the -- he didn't block the silver

22  vehicle in.  He came in and parked in a parking

23  space.  And I think it was in the Culver's parking

24  lot facing, facing towards.

25  Q.  Okay.  And just so the record's clear, the

1   Nissan was parked in a parking space in that lot?

2   A.   Yes, it was.  It was facing to the north, away

3   from the Subway.  And I think Trooper McFall parked

4   facing south in the Culver's parking lot.  But they

5   would be -- the vehicles would be fairly close to

6   each other.

7   Q.   And where were you parked?  Were you parked --

8   were you blocking the Nissan?

9   A.   No.  When I pulled in to speak with the two

10  subjects who were exiting the silver 2000 Nissan, I

11  pulled past it.  Ultimately I would have parked in

12  a parking spot upon exiting my vehicle so as not to

13  cause the patrons of the businesses to drive around

14  me and so I'm out of the way basically.

15  Q.   Okay.  Okay.  So, after you had this exchange

16  with the defendant about whether he had any drugs

17  or large amounts of money in the vehicle, what

18  happened next during the encounter?

19  A.   We, we spoke about if he would open the trunk

20  or not.  When he did that, I, I requested that they

21  identify their luggage, which we talked about a few

22  minutes ago.  And then ultimately I asked to search

23  the vehicle and its contents for contraband.

24  Q.   What did the defendant say?

25  A.   He agreed to that request.

1    Q.    Did you ask the passenger whether he agreed as

2    well?

3    A.    Yes, I did.

4    Q.    And what was his response?

5    A.    He, he indicated that that was okay with him

6    also.    I believe I asked him, Is that okay with

7    you, too?    And he indicated that it was.

8    Q.    And did you clarify to the defendant whether

9    or not he was required to give consent, whether he

10    could say no?

11    A.    Yes.

12    Q.    What did you say to him?

13    A.    I told him he didn't have to let me search the

14    car.

15    Q.    And did he indicate that he understood that?

16    A.    Yes.

17    Q.    So what happened then?

18    A.    I explained to Mr. Celeya that they were free

19    to go at any time.    And if they were headed into

20    the restaurant to eat or get some food or whatever,

21    you know, feel free.    And they could see us from,

22    from the restaurant, and we'd conduct our business.

23    And they chose to go into the restaurant.

24    Q.    And what did you do then?

25    A.    We commenced a manual search of the vehicle.

1  At some point Trooper McFall performed an external

2  sniff -- K-9 sniff of the vehicle utilizing K-9

3  Rocco, R-o-c-c-o.

4  Q.  And Rocco is trained to detect the odor of

5  narcotics?

6  A.  Yes, he is.

7  Q.  And the dog sniff was done prior to the manual

8  search; is that correct?

9  A.  Yes.

10  Q.  What were the results of that dog sniff?

11  A.  ISP K-9 Rocco did not indicate on the outside

12  of the vehicle to the presence of the odor of

13  marijuana, cocaine, methamphetamine or heroin.

14  Q.  What did you and Trooper McFall do then?

15  A.  We commenced a manual -- manual, consensual

16  search of the car.

17  Q.  And what, if anything, did you find during

18  that search?

19  A.  Located in the large black -- larger black

20  nylon suitcase was a large amount of United States

21  currency sealed in a FoodSaver bag.  Located in the

22  medium-sized black nylon suitcase was another large

23  amount of United States currency sealed in a

24  FoodSaver packaging.

25  Q.  Did you notice anything about the way the

1  currency itself was packaged within the bag?

2  A.  Yes.  It was rubber-banded in bundles.

3  Q.  And was there anything else in the bag with

4  the currency?

5  A.  Yes.  In the larger black nylon suitcase there

6  was a piece of paper with handwritten notes and

7  figures that appeared to be names or nicknames as

8  well as dollar figures in it.

9  Q.  Now, as I understand it, that piece of paper

10  was folded up while it was inside the bag?

11  A.  That's correct.  It was visible through the

12  FoodSaver packaging.  It was folded up.  I don't

13  recall -- I don't recall if it was folded to where

14  you couldn't see the handwritten notations or not,

15  but it was -- it was visible inside the FoodSaver

16  bags.

17  Q.  You took some photographs of these packages,

18  correct?

19  A.  I did.

20  Q.  So those photographs would indicate whether --

21  what was visible?

22  A.  Yes, they would.

23  Q.  Okay.  Now, based on your training and

24  experience, was there anything significant about

25  the way those items were packaged?

1  A.   Yes.

2  Q.   Can you explain that, please?

3  A.   Rubber-banded bundles of money sealed in

4  vacuum-sealed basically bricks in FoodSaver bags is

5  very consistent with proceeds of illegal narcotics

6  transactions.  And FoodSaver bags have become the

7  pretty much universal packaging for bulk

8  contraband.

9  Q.   Why is that?

10  A.   First of all, the bags come in tubes so you

11  can cut off exactly the size bag that you need,

12  whether it's 12 inches long or 60 inches long.  The

13  contraband can be placed within that packaging,

14  vacuum-sealed, remove much of the air.  It's pretty

15  -- it does a good job of preventing the odor from

16  escaping in a lot of cases.  And I think it's just

17  very, very convenient for the offenders to use.

18  Q.   Does it also prevent tampering?

19  A.   Sure.  Yeah.  It's -- one of the things about

20  FoodSaver bags is it's heat-sealed, and you can

21  tell if it's been tampered with.

22  Q.   You've seen this in your interdiction stops?

23  A.   Yes.  It is not quite exclusively but very

24  near exclusively the packaging of choice for kilo

25  quantities of cocaine.  It's particularly peculiar

1  to northern California cannabis traffickers.  They
2  really -- it's -- you almost never see anything
3  else.
4      And with bulk currency seizures, runs a very
5  high percentage now that it's going to be
6  vacuum-sealed in FoodSaver bags.
7  Q.  Now, after you and Trooper McFall -- as I
8  understand it, there were two packages in each bag,
9  is that correct, for a total of four?
10  A.  Yes.
11  Q.  After you and Trooper McFall located those
12  packages -- as I understand it, sometime during
13  this search a third trooper, Trooper Strouss, also
14  arrived?
15  A.  Yes.
16  Q.  And did he also assist with the search?
17  A.  Yes.  He, he helped us finish the search.  I
18  believe that the -- I don't know if we had already
19  located the currency in the suitcases by the time
20  he arrived or not, but he assisted us with
21  relocating the vehicle as well as maintaining
22  custody of the vehicle for the search.
23  Q.  And when you say "relocating the vehicle,"
24  you're talking about later on when the vehicle was
25  driven to the Geneseo Police Department?

A.   Yes.   Later on we relocated the subject and --
the vehicle and the two subjects to the Geneseo
Police Department.

Q.   Okay.   Sticking chronologically here then,
after you and the fellow trooper or troopers
located that currency, what did you do then?

A.   Trooper McFall and I entered the Subway
restaurant.   We requested that Mr. Celeya and the
other subject accompany us outside.   And at that
time we read the *Miranda* warning in English to both
subjects.   I believe I read it to Mr. Celeya in
English, and then both of us had a Spanish version
and had the two subjects read the *Miranda* warning
back to us in Spanish so that we were certain that
they understood it.

Q.   And after you did that, what did you do?

A.   We continued a manual search of the vehicle
for any other evidence, and we relocated -- Trooper
Strouss drove the vehicle to Geneseo P.D.   I
transported one of the subjects, and I believe
Trooper McFall transported the other.

Q.   Now, prior to transporting these two
individuals to the police department, did you
interview them?

A.   Briefly, yes.

1  Q.   Did you interview the defendant?

2  A.   Yes, I did.

3  Q.   And this *Miranda* waiver that you just

4  discussed, that took place at approximately 9:40

5  a.m.?

6  A.   Yes, it did.

7  Q.   Okay.  And the defendant agreed to speak with

8  you?

9  A.   Yes.

10  Q.   And what did -- what did you ask him, and what

11  did he say?

12  A.   He indicated to me that the currency in his

13  bag -- the large black nylon bag -- belonged to

14  him, that it had never been in a bank, and that it

15  was his life savings, I believe.

16  Q.   Did he tell you that he earned that money

17  buying and selling cars?

18  A.   At this time I don't have an independent

19  recollection of that.

20  Q.   Is there anything that would refresh your

21  recollection?

22  A.   The report that I prepared regarding this

23  incident.

24       MR. MEHOCHKO:  May I approach, Your Honor?

25       THE COURT:  You may.

1  BY MR. MEHOCHKO:

2  Q.   Sergeant Thulen, I'm showing you what's been

3  marked as Government's Exhibit Number 11.  Do you

4  recognize that?

5  A.   Yes.   This is the report that I prepared

6  detailing the incident that I'm testifying about

7  today.

8  Q.   Okay.  Would you please review that, please?

9  A.   Yes.

10  Q.   And specifically the portion that deals with

11  your interview with Mr. Celeya.

12  A.   I have reviewed that.

13  Q.   Does that refresh your recollection about what

14  Mr. Celeya identified as the source of those funds?

15  A.   Yes.

16  Q.   And what was that?

17  A.   That he -- the money came from him buying and

18  selling cars.

19  Q.   He told you it was approximately $40,000; is

20  that correct?

21  A.   That is correct.

22  Q.   Did he tell you -- what did he say, if

23  anything, about the other money that was located in

24  the vehicle, the money in the other suitcase?

25  A.   Sure.   The money in the smaller black nylon

1    suitcase, he indicated to me that that was not his,

2    his money.  He was unaware of it; he did not know

3    it was there.

4    Q.   Okay.  Fair enough.

5         Did the passenger -- did you interview the

6    passenger as well?

7    A.   I did.

8    Q.   And what, if anything, did the passenger tell

9    you about the money?

10   A.   I asked him if that money belonged to him, the

11   money in his suitcase -- the suitcase that he had

12   claimed.  He indicated to me that the only money

13   that he had was in his pockets and that the money

14   found in the medium-sized black nylon suitcase was

15   not his.

16   Q.   The defendant said it wasn't his, and the

17   passenger said it wasn't his.  Was there anybody

18   else in that vehicle?

19   A.   There was not.

20   Q.   Now, after you interviewed the defendant and

21   his passenger, is that when they were transferred

22   to the -- transported to the Geneseo Police

23   Department?

24   A.   Yes.

25   Q.   And the idea was that they would be

1  transported there; and then, as I understand it,

2  you notified investigators who would follow up on

3  the case?

4  A.   That is correct.

5  Q.   State police have essentially a dedicated unit

6  -- not necessarily a dedicated unit but

7  investigators that specialize in trying to

8  investigate and potentially further these

9  interdictions?

10  A.   Yes, they are very well-versed in narcotics

11  investigations.

12  Q.   And specifically how does that work?  What do

13  they do?

14  A.   I, I contact their supervisor or their unit by

15  telephone, and the Illinois State Police Zone 2

16  Investigations then dispatches officers to come and

17  assist in that investigation by doing interviews

18  and follow-up investigations with any documents or

19  indicia -- stuff located at the scene.  And they

20  follow up on that information.

21  Q.   And sometimes they'll actually do what's known

22  as a controlled delivery?

23  A.   That is correct, yes.

24  Q.   Which is to accompany the courier out of state

25  or to its final destination in an attempt to

1  identify others responsible?

2  A.  Absolutely, other criminals involved.  Sure.

3  Q.  Okay.  Okay.  So, you went back to the Geneseo

4  Police Department.  At that point did you, while

5  you're waiting for investigators, examine some of

6  the items that you'd seized?

7  A.  I did.  I photographed several of the items

8  and the contents of the -- of the vehicle and

9  opened the bundle of currency that had the

10  handwritten notations on the piece of paper with

11  it.

12  Q.  You took some photographs of that?

13  A.  I did.

14  Q.  Okay.  Did you review the contents of the

15  defendant's wallet?

16  A.  I did.

17  Q.  And as I understand it, there was an insurance

18  card in there?

19  A.  Yes.

20  Q.  Did you note anything unusual about that?

21      MR. TASEFF:  Judge, I object to unusual

22  features at this point since the defendant and the

23  passenger are handcuffed, placed in squad cars,

24  transported to a police department where they're

25  held for questioning, and the agent now is going to

1  cite what he believes to be unusual features about
2  physical evidence long after the defendant is
3  already in custody.
4      The question is, at the time that he -- the
5  defendant was placed into custody, is there
6  probable cause to support the arrest?
7      The government's response in this question
8  posed to this agent is bringing out and eliciting
9  after-acquired information that has no bearing on
10  the central issue raised in the motion that is
11  there and that is, was there probable cause to
12  arrest at the time of the seizure and not based
13  upon something that was followed -- or found in the
14  minutes, if not hours after this defendant was
15  already seized, detained and arrested.
16      THE COURT:  Mr. Mehochko?
17      MR. MEHOCHKO:  Judge, I'm trying to get the
18  factual record here.  If Mr. Taseff wants to argue
19  whether or not this is relevant, that's argument.
20  I would argue that it is relevant based upon the
21  facts that were developed during the course of the
22  investigation.
23      THE COURT:  Relevance to the issue -- ultimate
24  issue as to the charge or as to the issue of
25  probable cause for the arrest?

1    MR. MEHOCHKO:  The ultimate issue of probable

2  cause and/or reasonable suspicion for the arrest.

3  There's at least an argument.  I mean, my position

4  from the pleadings is clear.  I believe there's

5  probable cause at the time the defendant was

6  stopped and detained outside the Subway, but to the

7  extent there's any argument otherwise, I think the

8  investigation continued to develop after that.

9    THE COURT:  I'll sustain the objection.

10  BY MR. MEHOCHKO:

11  Q.  After you arrived at the Geneseo Police

12  Department, Trooper Thulen, what, if anything else,

13  did you do?

14  A.  I photographed the items from the vehicle and

15  opened the package from the larger bundle of

16  currency from the larger suitcase, removed that for

17  examination and photographed it.

18  Q.  What did you do then?

19  A.  Ultimately trooper -- I'm sorry, Special Agent

20  John Clark and Inspector Alex Chavira from

21  Blackhawk Area Task Force arrived and interviewed

22  both subjects.

23  Q.  Okay.  And those interviews took place

24  approximately in the afternoon, early afternoon?

25  A.  Early afternoon.  I don't recall exactly what

1   time.

2   Q.   At that point, as I understand it, they

3   essentially had taken over the investigation, and

4   your work was more or less done?

5   A.   Absolutely.  Yes.  I handed the investigation

6   off at that time.

7        MR. MEHOCHKO:  May I approach, Your Honor?

8        THE COURT:  Yes.

9   BY MR. MEHOCHKO:

10  Q.   Trooper, I'm showing you what's been marked as

11  Government's Exhibits 1 through 10.  Do you

12  recognize those?

13  A.   I do.

14  Q.   What are those?

15  A.   Exhibit 1 is a photocopy of the *Miranda*

16  warning in both English and Spanish that is -- that

17  was used on that day and is contained in the --

18  Q.   That's the *Miranda* waiver that you used to

19  advise the defendant outside the Subway?

20  A.   Yes.

21  Q.   And the Spanish portion is the portion that

22  you had him read back?

23  A.   Yes, it is.

24  Q.   And Exhibits 2 through -- 2 through 9 are

25  photographs; is that correct?

1  A.   That is correct.

2  Q.   Those are photographs of the evidence that you

3  took that day?

4  A.   Yes.  I took these photographs.

5       MR. MEHOCHKO:  Your Honor, I move to admit

6  Government's Exhibit 1 through 9, and then I'd like

7  to publish them and discuss them in detail with the

8  witness.

9       THE COURT:  Mr. Taseff?

10      MR. TASEFF:  No objection for purposes of this

11 hearing, Judge.

12      THE COURT:  They're admitted.

13      MR. MEHOCHKO:  Would the Court's preference be

14 to just use the overhead when we go through them?

15      THE COURT:  That's fine.  Whatever you want.

16      MR. MEHOCHKO:  Okay.

17      THE COURT:  It will also show up in front of

18 you or you --

19 BY MR. MEHOCHKO:

20 Q.   For the record, Trooper, I'm showing you

21 what's marked as Government's Exhibit 1.  That's

22 the *Miranda* waiver?

23 A.   Yes, it is.

24 Q.   And this specific waiver, where did this come

25 from?

1  A.   It comes from an annual pocket calendar that

2  the Fraternal Order of Police sends each of its

3  members.

4  Q.   And this photocopy is your actual copy,

5  correct?

6  A.   Yes.  It's, it's the one that I'm carrying in

7  my shirt pocket right now.

8  Q.   This is the one that you used to advise the

9  defendant?

10 A.   It is identical.  Actually, I believe the one

11 I'm carrying in my pocket today is from 2012.

12 Q.   Okay.

13 A.   It is identical.  They've been -- ever since

14 I've been with the state police we've had the same

15 one.

16 Q.   Okay.  Showing you Government's Exhibit 2,

17 what is that?

18 A.   This is the medium-sized black suitcase.

19      And I'd also like to point out that the label

20 -- because of our report-writing program, the label

21 below it that says it's the larger black suitcase,

22 that's not correct.  That's for the photo that

23 comes after that.  The label for this photo is

24 actually on the prior page of the report so that's

25 why they don't -- they're not in sync.

1  Q.  Okay.  So, for all these photo exhibits --

2  these were taken directly from your report,

3  correct?

4  A.  They were, yes.

5  Q.  So, the report itself will indicate on the

6  bottom -- there's a label, says Type, Other Photo

7  and the name.  It says, Currency From Larger Black

8  Suitcase.  That's actually not an accurate caption;

9  it refers to the following photo of the report?

10  A.  Yes.  It's a -- yes.

11  Q.  Okay.  But this would be the smaller suitcase?

12  A.  This is the -- yeah, the smaller black nylon

13  suitcase of the two.

14  Q.  Okay.  And Government's Exhibit 3, what is

15  that?

16  A.  This is the larger black suitcase, the

17  FoodSaver bag, bundles of currency, and the white

18  object is the notation from the FoodSaver bag.

19  Q.  What you referred to as the ledger?

20  A.  Yes, I -- yes.  The --

21  Q.  Have you seen those before in your experience

22  in drug interdiction?

23  A.  Yes.

24  Q.  Government's Exhibit 4, just another closer

25  photo of some of the currency?

A.   The rubber-banded currency in the FoodSaver
bag, yes.
Q.   These look like they were taken on the back of
the defendant's vehicle, on the trunk?
A.   That's correct.
Q.   Government's Exhibit 5, another photo.  This
would be the closer photo of the one with the
ledger?
A.   That is correct.
Q.   As well as the other package?
A.   That's correct.
Q.   Looks like the denominations are 50s, 20s;
believe I saw some 5s as well.  Do you recall the
denominations?  Was there anything significant
about the denominations of the bills as you sit
here today?
A.   I do not.  I believe that they were mostly
50s, 20s and 100s, though.
Q.   Government's Exhibit 6 is just the packages on
top of the vehicle?
A.   That's correct.  The ones on the right side
were the ones from the larger suitcase.  The ones
on the left were from the medium or smaller-sized
suitcase.
Q.   Government's Exhibit 7.  This is a photograph

1  of the bundle containing the ledger?

2  A.  That is correct.

3  Q.  If we zoom in a little bit, we can see -- this

4  is while it's still sealed in the package?

5  A.  That's correct.  It's still sealed in the

6  package.

7  Q.  Government's 8, what is that?

8  A.  That is the ledger from the package, unfolded,

9  after I removed it from the package for

10  examination.

11  Q.  And finally Government's 9?

12  A.  This is the insurance card for the vehicle,

13  the 2000 silver Nissan -- the silver 2000 Nissan

14  from the date in question.

15      MR. MEHOCHKO:  Judge, if I could have just one

16  moment?

17      Judge, those are my questions for this

18  witness.

19      THE COURT:  Do you intend to address

20  Exhibit 10, or did you --

21      MR. MEHOCHKO:  Not with this witness, Your

22  Honor.  It's the waiver that Agent Clark executed.

23      THE COURT:  All right.

24      Mr. Taseff?

25                    **CROSS-EXAMINATION**

1  BY MR. TASEFF:

2  Q.   Trooper, let's clarify a few matters before we

3  get into the meat of the cross here.

4       Let me return to Government's Exhibit 3.  This

5  is a photograph of one of the FoodSaver bags, and

6  on the face of that bag there appears to be some

7  white object.  Is that the ledger that you're

8  referring to?

9  A.   That is -- that is what I'm referring to, yes.

10 Q.   Now, by my vision, the way I'm looking at this

11 exhibit -- and, indeed, I have a copy of the

12 photograph so it's as clear as it's going to get

13 from the exhibit itself.  I don't see any writing

14 on that exhibit, do you, on that ledger that we see

15 on top of the plastic bag?

16 A.   On this particular photograph, it's difficult

17 to see.  I believe it is the upper right corner

18 where the blue writing or the writing is visible.

19 There is another close-up before it was removed

20 from the FoodSaver bag where it's, it's more clear.

21 Q.   So it appears that Government 3, the

22 resolution is not fine enough to see any

23 handwritten notations in the upper right-hand

24 corner of that white object in the middle of the

25 bag, correct?

1   A.   It's, it's difficult to -- it's impossible to

2   discern what the writing is, but I can see the

3   outlines of it.

4   Q.   Well, I'm going to show you defense --

5   Government Exhibit 7.  And here, Government

6   Exhibit 7, when we look at this photograph, we see

7   what appear to be five separate notations of

8   numerals, numbers.  Now, is 7 -- Government 7 the

9   same item as Government 3?

10  A.   Yes, it is.

11  Q.   But clearly one photograph -- 3 -- very hard

12  to see anything at all in the upper right-hand

13  corner of that white object, correct?

14  A.   I can see where there's writing, but I

15  obviously, with this resolution, can't read what

16  the writing is.

17  Q.   It doesn't appear that that photograph is

18  taken from any great distance from the object being

19  photographed, does it?

20  A.   I think the -- I think the resolution has to

21  do with the way we're looking it up.

22  Q.   But your testimony is that Government 7 is,

23  indeed, the very same object that appears in

24  Government 3?

25  A.   Yes, it is.  The writing on the upper right

1  corner is legible in this photo.

2  Q.  So, I take it, then, when you and Agent McFall

3  began searching the trunk and you opened those

4  suitcases, is this what you saw in one of the four

5  plastic bags inside one of the two suitcases?  Did

6  you see that white piece of paper with those

7  notations inside the freezer bag?

8  A.  Yes, we did.

9  Q.  And it wasn't until later at the station that

10 you slit open the bag and removed that ledger or

11 that piece of paper, that you unfolded it then and

12 got the greater number of numbers and handwritten

13 notations, correct?

14 A.  That is correct.

15 Q.  So to recap, Government Exhibit 3 is a

16 photograph of the same exhibit as is depicted in

17 Government Exhibit 7?

18 A.  Yes, that is correct.

19 Q.  Of the piece of paper inside the heat-sealed

20 plastic bag, correct?

21 A.  That is correct.

22 Q.  And Number 8 is that piece of paper retrieved

23 from the heat-sealed bag unfolded.  You couldn't

24 see these notations in plain view when you opened

25 that suitcase, could you?

1  A.   I, I couldn't read them like I can now,
2  unfolded.
3  Q.   You couldn't see those numbers as you examined
4  the exhibit, the package in the parking lot?
5  A.   I could see that there was additional writing.
6  Q.   All you could see was the exterior of that
7  piece of paper as depicted in Government 7,
8  correct?
9  A.   I could see the piece of paper with the
10  notations on the outside.
11  Q.   But you couldn't --
12  A.   And it was obvious that --
13       MR. MEHOCHKO:   Your Honor, object.  He's
14  trying to answer the question.  Mr. Taseff's
15  interrupting.
16       MR. TASEFF:   I can rephrase.
17  BY MR. TASEFF:
18  Q.   You could not make out what those other
19  notations were, correct?
20  A.   That's correct.  That is correct.  I could see
21  more writing, but I couldn't read them.
22  Q.   Now, also, as I listened to your testimony
23  this morning, you and -- you secure what you
24  believe is permission to search the vehicle, and
25  you make a point of telling Mr. Celeya that he's

1  free to leave, correct?

2  A.  That is correct.

3  Q.  So you suggest that if he wants to get

4  something to eat, if he wants to go into Subway,

5  he's free to do that so you and your fellow

6  officers could proceed with your business searching

7  that vehicle, correct?

8  A.  Yes.  He was free to do that.

9  Q.  So, Ramon -- Mr. Celeya and Mr. Estrella go

10  into the restaurant, do they not?

11  A.  They did.

12  Q.  They go into the restaurant while you and

13  McFall then begin opening the suitcases in the

14  trunk, correct?

15  A.  That is correct.

16  Q.  And when you open the suitcases in the trunk,

17  you find these packages of currency inside the

18  suitcases, didn't you?

19  A.  We did.

20  Q.  Now, at some point then you and McFall enter

21  the Subway, talk to Mr. Celeya and Mr. Estrella?

22  A.  That is correct.

23  Q.  Now, do you have your report with you?

24  A.  I think it was in the stack of photos that I

25  gave back to Mr. Mehochko.

1    Q.   I believe Mr. Mehochko asked you to examine

2    this report of yours, Government Exhibit 11,

3    correct?

4    A.   That is correct.

5    Q.   And this is the typewritten portion in your

6    narrative of the occurrence.   And then the

7    photographs that you've shown us and identified,

8    that became part of your report as well, correct?

9    A.   That's correct.

10   Q.   Let's go to page five of your typewritten

11   narrative.   Let's go to page five, and then let's

12   go to the fourth full paragraph on that page.

13        You see where the fourth full paragraph on the

14   page is on your report?

15   A.   Yes.

16   Q.   The one that says, "Trooper McFall and I went

17   into Subway" --

18   A.   Yes.

19   Q.   -- "and requested" --

20   A.   Yes.

21   Q.   Now, the copy I have that bears my notations

22   and highlights is up on the big screen here,

23   correct?

24   A.   That is correct.

25   Q.   So, let's read along with this portion of your

1    report.  You state at that time that McFall and you

2    went into the Subway restaurant and requested the

3    two subjects to step outside.  They complied.  "I"

4    -- meaning you -- "I placed handcuffs on Ramon, and

5    Trooper McFall placed handcuffs on Jesus.  The

6    handcuffs were checked for fit and double-locked

7    per ISP policy.  I placed Ramon in my squad car,

8    and Jesus was placed in Trooper McFall's squad.

9    Exhibit 1 and Exhibit 2 placed into the locked

10   trunk of my squad car."

11        It's only then, after Ramon is handcuffed and

12   in your squad car, that you read him the *Miranda*

13   rights from the card that you've identified today

14   as your carrying, correct?

15   A.   That's correct.

16   Q.   And then while Ramon is handcuffed and secured

17   in your squad car and given *Miranda* warnings in

18   both English and Spanish, then you inquire of him

19   about the black suitcase and the source of the

20   money, correct?

21   A.   Yes, that's correct.

22   Q.   So, Mr. Celeya was not free to leave when you

23   and McFall escorted him out of that Subway,

24   correct?

25   A.   I think that is correct.

1  Q.  You cuffed him, put him in a squad car, you

2  gave him *Miranda*, and then you questioned him,

3  correct?

4  A.  That is correct.

5  Q.  Do you speak Spanish?

6  A.  I, I do not.  Very little.  I know a few

7  words.

8  Q.  On a scale of one to ten, ten being most

9  proficient, how would you rank your

10  Spanish-speaking skills?

11  A.  Probably a one.

12  Q.  Okay.  Because Mr. Estrella, you said, clearly

13  -- it was obvious to you, fair statement, Estrella

14  couldn't speak much English?

15  A.  Yes.  It seemed to me that Mr. Celeya was

16  clearly a better speaker of English, and he tended

17  to answer the questions whether they were directed

18  to him or not, so that indicated to me that

19  Mr. Estrella probably didn't speak very -- probably

20  wasn't real -- very proficient in English.

21      MR. TASEFF:  If I may, Judge, I need to call

22  up my exhibit here.

23      We'll get to this in a second.

24  BY MR. TASEFF:

25  Q.  On the morning of September 26th, 2010, at

1 about 9:30 a.m. you were on duty on Interstate 80
2 performing stationary patrol at or near milepost 20
3 facing westbound traffic on I-80, correct?
4 A.   That is correct.
5 Q.   So, showing -- you're obviously very familiar
6 with the juncture of I-80 and Illinois Route 82 in
7 Henry County, are you not?
8 A.   I am.
9 Q.   Showing you Defense Exhibit 2 for
10 identification.  Do you recognize the scene
11 depicted in Defense 2?
12 A.   Yes, I do.
13 Q.   What is it?
14 A.   This is the I-80/Route 82 interchange, and at
15 the upper left is the Beck's convenience store
16 truck stop.  Across Route 82 from that is the
17 Wal-Mart parking lot.
18 Q.   Okay.  I believe if you use your finger and
19 you press where the Beck's gas station is, it will
20 leave a notation.
21 A.   Yes.
22 Q.   Okay.  And indeed I have -- thanks to the very
23 capable courtroom staff in this court, I have one
24 of these laser pointers.
25      So, where the arrow is and with my red laser

1  point, we're looking at the Beck's gas station at

2  or near the juncture of I-80 and Route 82, correct?

3  A.   Yes.

4  Q.   Now, your location where you're performing the

5  stationary patrol is slightly east of the exit ramp

6  for westbound traffic on I-80, correct?

7  A.   That is correct.

8  Q.   So, I'm using my red laser point, but you show

9  us on the face of the big screen, you note where

10  your squad car was stationary that morning.

11  A.   It would be farther -- it would be off the

12  picture to the lower right.  It's not depicted on

13  this -- on this photo.  It would be further --

14  Q.   So we'd have to go further east, correct?

15  A.   We'd have to go further east, yeah.

16  Q.   Further east from where we see the exit ramp,

17  correct?

18  A.   That is correct.

19  Q.   Maybe, what, 100 meters, 200 meters,

20  300 meters?

21  A.   It's a little hard to tell from the photo, but

22  I'm guessing at least 100 to 200 yards maybe.

23  Maybe a half mile from the bottom of the depiction

24  that's up right now.

25  Q.   Now, on the morning of September 26th -- and

1   by my calculations, that's one week to the day

2   three years ago that this happened, correct?

3   A.   That's correct.

4   Q.   We were all so much younger then.

5        On that date you're performing your criminal

6   interdiction duties, correct?

7   A.   Among my other duties as a state police

8   officer, sure.

9   Q.   As other duties are traffic patrol,

10  enforcement of the motor vehicle code, correct?

11  A.   Absolutely.

12  Q.   On that date and at that time, were you

13  operating your radar device?

14  A.   I'm sure it was powered up.  I don't know when

15  I had used it before the incident we talked about

16  here.

17  Q.   You did not radar or clock the Nissan with the

18  New York plates?

19  A.   No.  It was obvious to me that the vehicle was

20  at or below the speed limit.

21  Q.   On that morning before you performed or began

22  your shift -- what was your shift that day if

23  you're working at 9:30?

24  A.   If I was working at 9:30, it was probably

25  6 a.m. to 4 p.m., although it does vary some.

1   Q.   And you're driving an unmarked Crown Vic?

2   A.   That's correct.

3   Q.   Fully equipped?

4   A.   Fully equipped.

5   Q.   With a mobile data computer system?

6   A.   Yes.

7   Q.   With dash-mounted video camera?

8   A.   Yes.

9   Q.   With an audio recording system?

10  A.   Yes.

11  Q.   That enabled you to utilize a recording device

12  and microphone under your collar?

13  A.   It's on my belt, but yes.

14  Q.   So, you had that technological capability that

15  morning when you encountered Mr. Celeya, correct?

16  A.   That's correct.

17  Q.   Did you -- at any time prior to or during your

18  encounter with Mr. Celeya, did you at any time

19  activate your video recording system?

20  A.   I did not.

21  Q.   Did you at any time activate your audio

22  recording system?

23  A.   They would be simultaneous, and no.

24  Q.   Why?

25  A.   Because it would not be either required or

1  appropriate as I understand Illinois State Police

2  policy or, at that time, the Illinois eavesdropping

3  law.

4  Q.  Well, you can always ask a suspect -- tell him

5  during your encounter that we're recording things,

6  correct, and secure his consent on the camera or on

7  the tape so as to preserve and accurately capture

8  everything that happened?

9  A.  I believe you could, yes.  I believe you could

10  do almost anything with consent.

11  Q.  And, indeed, prior to this date in September

12  2010 we've had many cases where you've utilized

13  that technology, correct?

14  A.  Only on traffic stops where I was

15  investigating the -- a traffic violation as is

16  appropriate by policy and actual state law now.

17  Q.  So, I take it from your response that this was

18  not a case where there was any traffic violation?

19  A.  No, there was no traffic violation whatsoever

20  that I observed.

21  Q.  So, when you first observed Mr. Celeya's

22  vehicle approaching your location traveling

23  westbound, there was nothing that you could observe

24  that led you to even suspect he was traveling in

25  excess of the speed limit, correct?

1  A.   No, I, I do not believe he was traveling in
2  excess of the speed limit.
3  Q.   Well -- and you saw that vehicle what distance
4  when you made your initial observation and saw it
5  approaching your location?
6  A.   At that location, probably a third of a mile
7  to half a mile.
8  Q.   Okay.  So --
9  A.   A third of a mile.
10  Q.   -- in that distance as you're watching the car
11  approach you, you do not observe it engage in
12  improper lane usage, excess speed or any unusual or
13  suspicious driving maneuver, correct?
14  A.   No traffic violation, no.  I certainly would
15  have documented that.
16  Q.   But you made note and you testified today that
17  when the vehicle passed you, the driver appeared
18  rigid and tense and wouldn't look at you, correct?
19  A.   That is correct.
20  Q.   And you assigned to that some measure of
21  suspiciousness, that the motorist didn't look at
22  you in an obvious unmarked squad car?  I mean,
23  you're parked in the median, correct?
24  A.   That is correct.
25  Q.   You've got a souped-up Crown Vic, right?

1  A.   I'm not sure how souped up it is, but it's a

2  Crown Vic, yeah.

3  Q.   Even you mentioned that it's pretty obvious

4  it's a squad car?

5  A.   It, it is.

6  Q.   Even by your standards, correct?

7  A.   I think the Crown Vic has been around long

8  enough that -- yeah.

9  Q.   So, the motorist here drove by you and

10  continued maybe 200 meters to the exit ramp,

11  correct?

12  A.   I think it's closer -- it's probably a third

13  to half a mile.

14  Q.   Okay.

15  A.   That's approximately.

16  Q.   But the vehicle approached that exit ramp, and

17  because of the nature of the exit ramp -- isn't

18  there even a sign there that says decrease speed as

19  you exit off I-80 onto the ramp?

20  A.   There is a -- on the ramp itself, there's

21  probably a yellow advisory speed sign on the ramp

22  itself, sure.

23  Q.   So, compliance with the sign and due caution

24  would lead a cautious motorist to decrease speed as

25  he approaches the ramp and then proceeds onto the

1  ramp to exit off of I-80, correct?

2  A.  Well --

3  Q.  Wouldn't you agree with that?  Due caution

4  would require that you slow down before you hit an

5  exit ramp?

6  A.  Well, a couple things about this exit ramp.

7  There is an exit lane approaching the ramp.

8  There's actually three lanes for some distance,

9  possibly that entire frame.  I can't tell if

10  there's a -- one, two -- that entire frame might

11  have three lanes westbound.  One of them is an exit

12  lane to the ramp and, in practical purpose, the

13  ramp is actually fairly straight.

14      Do people slow down before they exit?  I'm not

15  sure if that was the question.  Not really at the

16  point where I was stationary.  I mean, the part

17  where I was stationary, the exit lane -- the third

18  lane for the exit ramp doesn't even exist at that

19  location.

20  Q.  Well, the motorist then would hit the ramp and

21  then come to a stop at the top of the ramp,

22  correct?

23  A.  Yeah, ultimately.  I'd call it the bottom of

24  the ramp, sure.  At the end of the ramp there's a

25  stop sign.

1  Q.   And then would proceed north on Route 82,
2  correct?
3  A.   That's what this vehicle did, yes.  You can go
4  either way, but he went north.
5  Q.   Past the Beck's station on the left, correct?
6  A.   Past the gas station on the left.
7  Q.   Make a right onto Bestor Drive, correct?
8  A.   Oh.  No, actually that --
9  Q.   Or is this the street right here?
10  A.   That is Bestor Drive going into the Wal-Mart.
11  Q.   Yes.  And Google Earth says that 100 East
12  Bestor is where the Subway restaurant is.  Is this
13  where it is, sir?
14  A.   No, it's actually not.  That's the --
15  Q.   That's the Wal-Mart parking lot, isn't it?
16  A.   That's the Wal-Mart parking lot.  It sure is.
17  Q.   So, where is the Culver's and the Subway?  Is
18  it here (indicating)?
19  A.   Interestingly enough, right below your laser
20  pointer, that's the old Subway restaurant that is
21  now unoccupied.
22  Q.   Okay.
23  A.   And that is not where this incident occurred.
24  Q.   Well, show me.
25  A.   If you continue --

1   Q.   Use your monitor and put X marks the spot.

2   A.   Sure.  You would have to continue north on

3   Route 82.

4   Q.   Okay.

5   A.   Past that new arrow.  And on the west side of

6   the road --

7   Q.   Or left.  Left side.

8   A.   Or left, sure.  There's a -- there's a --

9   there's a Subway restaurant in a small strip mall

10  with the Culver's being north of that.  So the, the

11  -- the Subway restaurant actually is not depicted

12  in this -- in this photo.

13  Q.   Okay.  It's further north?

14  A.   It's further north, yeah.

15  Q.   Now, you were previously -- before you began

16  following that vehicle, you were at a location that

17  you had called in to your Dispatch so Dispatch and

18  your district headquarters would know where you're

19  at, correct?  You were at a certain mile marker --

20  A.   Oh --

21  Q.   -- when you first observed the vehicle?

22  A.   Yes, but that, that location isn't reported.

23  I --

24  Q.   But when -- it's not reported, is it?  In

25  fact, none of this seeing the car on the highway

1  even appears in your report, does it?

2  A.   Right.

3  Q.   In fact --

4  A.   Maybe I misunderstood your question, but my

5  Dispatch wouldn't know necessarily what crossover

6  I'm sitting at, where I'm sitting at.

7  Q.   But if you're performing your patrol duties

8  stationary, to move from that stationary post to

9  begin following a vehicle would normally require

10 that you call in your location or what you're

11 doing, correct?

12 A.   No, it would not.

13 Q.   So, you have your radio with you where you

14 communicate with your dispatcher, correct?

15 A.   That's correct.

16 Q.   When you chose to follow this vehicle that you

17 have testified was not traveling in excess of the

18 speed limit and had not violated any motor vehicle

19 law, when you chose to leave the highway and follow

20 it to a commercial business premise, did you call

21 in to your Dispatch and report to them what you

22 were doing and where you were?

23 A.   No.

24 Q.   Is it the duty of Illinois state troopers to

25 patrol private commercial premises off interstate

1  highways or state highways?

2  A.  I, I think that you can find Illinois state

3  police officers at almost every public location in

4  the state.

5  Q.  Well, you chose that morning to leave your

6  spot on I-80 and follow this car off the highway

7  and onto Route 82?

8  A.  I did.

9  Q.  Why?

10  A.  Because of the vehicle, the manner it was

11  driven, the demeanor of the driver.  And another

12  item of interest which we hadn't discussed earlier

13  was the -- at that time the gold-colored New York

14  registration with black writing was very newly

15  issued so I knew that that registration was fairly

16  recently issued on the vehicle.  It was one of the

17  first gold-and-black New York registrations that

18  I'd seen of that type and design since they changed

19  the design.

20  Q.  So, for those three reasons you chose to

21  follow the car?

22  A.  Yes.

23  Q.  Correct?

24  A.  Yes.  And, and at least --

25  Q.  Directing your attention to your report,

1  Government Exhibit 11, that report contains those

2  facts which you believed were important about what

3  you saw, what you heard and what you did that day,

4  correct?

5  A.  That's correct.

6  Q.  Because all of this occurred almost three

7  years ago, didn't it?

8  A.  Yes, it did.

9  Q.  And with all of the hundreds or scores of

10  traffic stops that you make on a daily basis,

11  monthly basis, yearly basis, you want to have an

12  accurate report that logs all important facts about

13  what you did in a traffic situation, correct?

14  A.  That's correct.

15  Q.  Let's go to page four of your report.

16      May we have the ELMO?  Thank you.

17      Page four of your report begins in your

18  narrative, and I quote, "On 9/26/10 at

19  approximately 9:30 a.m., Reporting Officer Sergeant

20  C. Thulen was driving through the parking lot of

21  the Subway restaurant at 100 Bestor Drive in

22  Geneseo.  At that time and location, I observed two

23  male subjects exiting a silver 2000 Nissan Maxima

24  bearing New York registration FEB 6951 which was in

25  a parked location," unquote.

1        That's how the narrative begins, correct?

2    A.   That's correct.

3    Q.   And nowhere in your official report do you

4    indicate anything about your first observations of

5    that vehicle on Interstate 80 and your decision and

6    the reasons therefore to follow it, correct?

7    A.   That's correct.

8    Q.   Did you at any time run a vehicle registration

9    of that plate and of that registration prior to

10   handcuffing Mr. Celeya?  Did you run the plate at

11   any time before you employed the cuffs?

12   A.   I don't know the answer to that.  I may have.

13   If I could have keyed it in very quickly before I

14   contacted Mr. Celeya, I would have.  I may not have

15   had time.  I don't know.

16   Q.   There's absolutely no reference to that factor

17   either, is there?

18   A.   That is correct.

19   Q.   Did you at any time prior to slapping cuffs on

20   Mr. Celeya run a criminal history check on him with

21   your mobile data terminal?

22   A.   I did not.

23   Q.   Did either of your fellow officers?

24   A.   No.  I --

25   Q.   So, during all portions of your encounter with

1  Celeya and Estrella at the parking lot outside

2  Subway, you had no information of his ever even

3  being arrested at any time in his life, correct?

4  A.   I did not have that information.

5  Q.   No indication of any NADDIS numbers, correct?

6  A.   That's correct.

7  Q.   What's NADDIS, N-A-D-D-I-S?

8  A.   That's a federal database.  It has to do with

9  federal investigations.  I'm not sure what the

10 initials stand for.

11 Q.   Well, there's also a state police database as

12 well, correct?

13 A.   That is correct.

14 Q.   So, you can run a full criminal history check

15 of anybody you stop or come in contact with,

16 correct?

17 A.   I can.

18 Q.   And you had none of that information available

19 to you prior to your placing Mr. Celeya in

20 handcuffs and putting him in your squad, correct?

21 A.   That is correct.

22 Q.   Furthermore, throughout your encounter with

23 Mr. Celeya, did he appear to you to be under the

24 influence of any alcohol or drug or some other

25 substance?

A.   No.

Q.   Did you notice any unusual, suspicious odor
emanating from the vehicle?

A.   No.

Q.   Did you notice any object in plain view in the
passenger compartment or on or about his person
that you would suspect as being consistent with his
possessing any contraband?

A.   No.

Q.   No smoking devices such as pipes, bongs,
rolling papers?  There was none of that in the car,
was there?

A.   There was not.

Q.   There was no large amount of fast-food
wrappings and debris suggesting cross-country
travelers or eating on the fly?  There was none of
that in this car either, was there?

A.   Not that I remember, no.

Q.   And, indeed, when you caught up with this car,
you saw it parked outside the Subway and the two
occupants getting out to enter, correct?

A.   That's correct.

Q.   And you drove by and chose at that time -- you
rolled down your window, didn't you?

A.   I did.

1  Q.  And you -- and while seated in the squad car
2  commenced this discussion, Hey, how you doing, that
3  kind of stuff?
4  A.  Yes.
5  Q.  Why did you feel at that time that you wanted
6  to engage them in conversation, knowing that they
7  had not done anything in violation of the motor
8  vehicle code and had lawfully parked their car
9  outside a commercial business establishment that
10  was open for business this morning?  Why would an
11  officer of your experience and stature at the
12  Illinois State Police, why would you deem it
13  important enough to leave the highway and go talk
14  to these people outside the Subway?
15  A.  Because the few minutes that I spend doing
16  that sometimes results in a discovery of traveling
17  criminals committing felonies and the discovery of
18  large amounts of bulk contraband as well as large
19  amounts of bulk currency.  And that short, friendly
20  conversation not only helps me locate these
21  criminals but, I believe, leaves a very favorable
22  impression on the motoring public that I contact in
23  this friendly manner.
24  Q.  Well, I'm sure it does.  But what I'm asking
25  you is, of all the -- and we're talking a Wal-Mart

1  business establishment just south of this, correct?

2  A.  Sure.  Yeah.

3  Q.  We're talking Culver's, another fast-food

4  chain right next door, correct?

5  A.  Yes.

6  Q.  All these people are open for business,

7  correct?

8  A.  That's correct.

9  Q.  And vehicles frequently get off I-80 to go up

10  onto 82 and get gas or fast food to be on their

11  way, correct?

12  A.  Yes.

13  Q.  Why did you see fit, why did you choose to

14  encounter Celeya and Estrella that morning at

15  Subway as opposed to any other vehicle that had

16  exited off the road or any other vehicle that was

17  in the parking lot?  Why was the attention focused

18  on Ramon?

19  A.  Because of my observations on the interstate.

20  Q.  Observations of which are not recorded,

21  correct --

22  A.  That's correct.  My report began --

23  Q.  -- in your official report?

24  A.  My report began when my -- I don't think that

25  physical contact is the right phrase, but when I

1  actually had a face-to-face conversation is when my

2  report starts.

3  Q.   Well, wouldn't your report start with the

4  observations on the highway itself if it's

5  important enough three years to tell a federal

6  judge why you chose to stop that car?

7  A.   It was -- my report tries to foresee what's

8  important, and I'm not always accurate with that.

9  Q.   But your report doesn't give us the full

10  picture, correct?

11  A.   In retrospect, I probably should have started

12  that report earlier, but I started it when I

13  actually had a face-to-face conversation with the

14  two occupants of the silver 2000 Nissan.

15  Q.   And, indeed, a fair reading of your report

16  would indicate that that's the first sighting of

17  that vehicle you ever had that morning in the

18  Subway parking lot, correct?  Couldn't one read it

19  that way, Sergeant?

20  A.   Well, I don't really have any way to know

21  that, what other people would think, but --

22  Q.   This is how you chose to write your report?

23  A.   Pretty standard language on my part as far as

24  initially contacting the vehicle and its occupants.

25  Q.   You never ran any kind of I.D. on Mr. Celeya,

1  did you?

2  A.   I looked at the identity documents that they

3  handed me and handed them directly back to them

4  after observing the place of residence and what

5  type of documents they were.

6  Q.   This is -- this is interesting now.  You're

7  asking for the I.D., and you're asking all of these

8  questions -- where are you going, where have you

9  been, who owns the car -- all the questions that

10  you've done.  And you're telling us now that you

11  never radioed in to Dispatch what you were doing,

12  correct?

13  A.   That is correct.

14  Q.   When did Mr. McFall show up on the scene with

15  his K-9?

16  A.   It was within the -- within the first few

17  minutes of the contact.  It was before we initiated

18  the search.  It was within a few -- a few moments.

19  Q.   Within a few moments --

20  A.   Sure.

21  Q.   -- of your encountering these two individuals

22  in the parking lot, correct?

23  A.   That's correct.

24  Q.   And since you did not alert Dispatch -- let's

25  make sure we have this understood.

1    When you radioed Dispatch, your communication

2  is overheard by other agents or other troopers on

3  the same watch, correct?

4  A.    That's correct.

5  Q.    So, you chose to follow this car off the

6  interstate to the Subway parking lot without

7  Dispatch being advised what you were doing and

8  where you were, correct?

9  A.    Yes, that's correct.

10  Q.    And just by coincidence, a minute or two --

11  your words -- minutes after you encounter these two

12  people in the parking lot, Trooper McFall, who is

13  your shift's K-9 officer, correct --

14  A.    That's correct.

15  Q.    -- happens to show up unannounced, just by

16  chance, to assist you in conducting this consensual

17  encounter with these two individuals, correct?

18  A.    No.

19  Q.    Well --

20  A.    It was no -- it was not a coincidence.  I

21  requested that he come to my location.

22  Q.    Okay.  Let's flesh that out.  When did you

23  request that McFall join you at the Subway parking

24  lot?

25  A.    It was probably after learning that Mr. Celeya

1  was in a third-party vehicle and that he lived in
2  New York at a location that he couldn't remember
3  the address and that -- and that he was traveling
4  with a person who he claimed to know for a long
5  time but didn't know his last name.
6  Q.  Okay.  And, indeed, none of that is in your
7  report, about summoning McFall with the K-9 to the
8  scene, is it?
9  A.  I'd have to look at my report, but I -- I'd be
10  willing to trust you on that because I may not have
11  put that in there.
12  Q.  And, indeed, have you talked to McFall about
13  this incident since this matter was charged in
14  federal court and these motions were filed and this
15  case was set for hearing today?  Have you discussed
16  matters with McFall?
17  A.  Yes.
18  Q.  About why he arrived and assisted you with his
19  K-9 Rocco?  Have you talked to him?
20  A.  I, I have talked to him.
21  Q.  As he prepared an incident report as you did
22  in this case?
23  A.  I believe that the written report that he
24  created had to do with the K-9 being used,
25  statistic gathering.  I believe it's his K-9 report

1  to the K-9 section of the Illinois State Police
2  that he wrote.
3  Q.  Well, normally a K-9 officer is not going to
4  go to any scene unless he's dispatched or directed
5  to, correct?
6  A.  I am certain that I requested Trooper McFall
7  come to my location.  That is how he knew to come
8  to the Subway restaurant.
9  Q.  Because he has a specialized duty, correct?
10  A.  He, he is a trooper.  He is a K-9 handler.
11  There's, there's two -- there's two reasons to
12  request him.  First of all, it's my safety because
13  he's another trooper, but also because he's a K-9
14  officer certainly.
15  Q.  Absolutely.  He's K-9.
16      So, if you don't call in your location, your
17  fellow officers don't know where you are to help
18  you on a traffic stop, correct?
19  A.  That would be a correct statement.
20  Q.  So, you did, indeed, call for McFall's
21  assistance?
22  A.  I requested that Trooper McFall come to that
23  location.  Now, that may have been on the radio, on
24  a car-to-car frequency, but it was very likely on
25  the mobile data computer.  I don't recall which.

1  But I have no doubt that I requested Trooper McFall

2  come to my location.

3  Q.   Radio dispatch tapes are tape-recorded, aren't

4  they?

5  A.   Yes.

6  Q.   So, all communications between the trooper in

7  the field and the dispatcher is recorded and

8  preserved, correct?

9  A.   That is correct, for a period of time.

10  Q.   In September of 2010, what policy, practice

11  and custom of District 7 was there for purposes of

12  preserving radio dispatch tapes?

13  A.   That's not my area of expertise.  It's either

14  30 or 60 days, however.

15  Q.   So, those tapes were destroyed --

16  A.   Yes.

17  Q.   -- or erased?

18  A.   Yes.  They're commonly erased unless, unless a

19  request is made to --

20  Q.   Did you carry a cell phone that morning?

21  A.   -- preserve those.

22       Yes.

23  Q.   Did you use your cell phone to call McFall?

24  A.   No, I don't think -- I don't know, but it very

25  likely was the mobile data computer because that

1  was my custom.

2  Q.  Well, the Dispatch operator not only records

3  all communication but makes handwritten notes,

4  correct?

5  A.  I don't believe -- I don't believe there's

6  much handwriting that goes on in the radio room

7  that I know.

8  Q.  Isn't it true that troopers can go to Dispatch

9  and look over those notes to make sure they are

10  properly reporting their cases?  They can get

11  times, dates, places and substance of

12  communications?

13  A.  Yes.  There is an incident log created if an

14  incident is created.

15  Q.  Okay.  Well, I assume an incident was created

16  in this case, wasn't it?

17  A.  Absolutely.

18  Q.  Okay.  Are those Dispatch logs available to

19  you or to us to this day?

20  A.  Those would be, yes.  Those are preserved

21  indefinitely.

22  Q.  And those are the handwritten logs or the

23  notations that the dispatcher makes, correct?

24  A.  Well, they would be computerized and

25  typewritten.  I mean, handwritten to me means a pen

1  and paper, but it's there.  There's physical --

2  Q.   The dispatcher's taking it and making

3  contemporaneous typewritten notes into a computer?

4  A.   Yes.

5  Q.   The logbook, you're saying?

6  A.   Yes.

7  Q.   So, if I issued a subpoena to your District 7,

8  I can get all of her dispatch notes from that

9  morning?

10  A.   Absolutely.

11  Q.   Trooper Strouss happened to show up, too, a

12  little bit after Trooper McFall, correct?

13  A.   That probably wasn't a coincidence either.

14  I'm sure he was summoned to the location.

15  Q.   Well, tell us -- tell us how that occurred

16  since the report doesn't tell us how it happened.

17  A.   Either by car-to-car radio or, most likely,

18  mobile data computer.

19  Q.   So, three state troopers, three squad cars

20  arrive at the scene of a consensual encounter with

21  Mr. Celeya and his traveling companion, correct?

22  A.   That's correct.

23  Q.   You'd worked with McFall prior to that date on

24  numerous cases, hadn't you?

25  A.   Yes, I had.

1  Q.  In fact, you told us that for years past you

2  were -- you were a K-9 handler yourself?

3  A.  Yes, I'm actually the former handler of ISP

4  K-9 Rocco that Trooper McFall was handling on that

5  day.

6  Q.  So, both you and McFall have a vast amount of

7  experience using this particular dog?

8  A.  Yes.

9  Q.  You trained it?

10  A.  Yes.

11  Q.  You develop a very special attachment to those

12  animals, do you not?

13  A.  Yes.

14  Q.  And those dogs are graded for accuracy, are

15  they not?

16  A.  Yes.

17  Q.  And, indeed, the report that McFall prepared

18  had certain boxes, one of which said False

19  Positive, correct --

20  A.  No.

21  Q.  -- as an option for the dog?

22      The dog did not alert in this case, right?

23  A.  I'm not aware of -- no, I'm not aware of any

24  -- no, the fact that the K-9 did not indicate on

25  the vehicle only indicates to me that he did not

1  detect the odor or the odor was not escaping.  But

2  the K-9 did not indicate on the odor of marijuana,

3  cocaine, methamphetamine or heroin.

4  Q.   So, let me rephrase because --

5  A.   Sure.

6  Q.   You trust that dog from having worked with it

7  for some time, correct?

8  A.   Yes, he's an outstanding K-9.

9  Q.   McFall feels the same way towards Rocco,

10 correct?

11 A.   Yes.

12 Q.   Rocco was brought to the scene at your request

13 so a walk-around, free-air sniff could be

14 conducted, correct?

15 A.   That is correct.  That is what happened, yes.

16 Q.   And, indeed, that trunk was open when Rocco

17 did the walk-around, wasn't it?

18 A.   No, I don't believe it was.

19 Q.   You don't believe it was?  You hadn't popped

20 the trunk yet?  Didn't you tell us that he opened

21 the trunk and --

22 A.   Yes.

23 Q.   -- then McFall arrived?

24 A.   I don't think so.

25 Q.   Your report would tell us, wouldn't it?

1  A.  Well, I would hope so.

2  Q.  The top of page five of your report, first

3  full paragraph.  See where it says, and I quote, "I

4  asked Ramon if there was anything illegal in the

5  car.  He stated there was not.  I asked if he would

6  mind opening the trunk.  He agreed.  In the trunk

7  was various bags and items from designer stores as

8  well as a large black suitcase and smaller black

9  suitcase.  I asked Ramon which suitcase was his.

10 He indicated the larger black suitcase.  I asked

11 Jesus which suitcase was his.  He indicated the

12 smaller black suitcase.  Ramon explained that the

13 items in the shopping bag were gifts for his

14 family," unquote.

15      That's what the first full paragraph of your

16 narrative states, correct?

17 A.  That is correct.

18 Q.  Read for us the next sentence.

19 A.  I'm sorry.  I don't know where you left off.

20 Q.  Well, at the end of the first full paragraph.

21 Read for us the next sentence.

22 A.  "I told them they" --

23 Q.  No, it says, "By now, Trooper McFall arrived,"

24 correct?

25 A.  Oh.  I'm sorry.  I lost my spot.

1  Q.   Right here.

2  A.   I, I know it says that, yes.  It does.

3  Q.   And then Trooper McFall -- next full paragraph

4  -- conducted the K-9 sniff on the outside, correct?

5  A.   Yes, the outside of the Nissan, an external

6  K-9 sniff.

7  Q.   There's nothing in your report that would

8  indicate that the trunk was closed before McFall

9  and Rocco did the free-air test, is there?

10  A.   No, there is not.

11  Q.   Rocco did the full walk-around on the vehicle,

12  correct?

13  A.   Yes.

14  Q.   Rocco is the dog that you have trained, that

15  McFall has used and that you trust implicitly,

16  correct?

17  A.   He has been a very accurate K-9.

18  Q.   And that K-9 did not alert for the presence of

19  any odor of those substances that you enumerated,

20  correct?

21  A.   On the external of the vehicle, that's

22  correct.

23  Q.   You can't tell us from the report whether that

24  trunk was up or down, thereby exposing those

25  suitcases?

1    A.   The report does not indicate that.   However, I

2    do find it a little unlikely that we would perform

3    a K-9 sniff of the external of the vehicle with the

4    trunk open.

5    Q.   But three years ago you can't tell us with any

6    certainty, can you?

7    A.   Find it unlikely, but that's correct.   It has

8    been three years ago.

9    Q.   These freezer bags, frozen food bags or

10   FoodSaver bags --

11   A.   FoodSaver bags, yes.

12   Q.   I recall years ago seeing something on TV, a

13   Ronco style vacuum-sealer bag.   Do you know what

14   I'm talking about?   You take these bags and stuff

15   them with meat or whatever you want to freeze, and

16   you run it through; and what the machine does, it

17   sucks the air out, correct?

18   A.   That was probably a FoodSaver commercial,

19   sure.   That is the legitimate use of this product.

20   Q.   And then -- and then the machine heat-seals it

21   so it preserves it, correct?

22   A.   Yes.   Yep.

23   Q.   And by putting paper products in such a

24   FoodSaver bag, it ensures that there is no moisture

25   that could contaminate or rot or infect the

1  contents, correct?

2  A.  Yes.

3  Q.  So, there's four bags, one having a piece of

4  paper folded up with five separate numbers

5  attached, correct?

6  A.  That's correct.

7  Q.  No handwritten notations that you can see from

8  the number that would indicate a person's name, a

9  phone number or any identifying information,

10  correct?

11  A.  Yes.

12  Q.  And by the time Ramon Celeya was summoned out

13  of the Subway, you and McFall cuffed, separate

14  squad cars, and the plan was to take them to

15  Geneseo Police Department?

16  A.  Yes, for further investigation, certainly.

17  Q.  How far is Geneseo P.D. from that location

18  where this occurred?

19  A.  It's about a mile and a half, two miles.  I'm

20  estimating, of course.

21      MR. TASEFF:  May I have just one moment,

22  Judge?

23      THE COURT:  Yes.

24      MR. TASEFF:  Those are my questions.

25      THE COURT:  For the record, you asked why he

1  chose to follow the car.  There were three reasons.

2  I got two -- demeanor, fairly recent registration.

3  What was the third?  Can you recall what the answer

4  was?

5      MR. TASEFF:  Rigid, tense.

6      MR. MEHOCHKO:  I recall it being the manner in

7  which the car was driven, Your Honor.

8      THE COURT:  Okay.  Thank you.

9      Mr. Mehochko, redirect.

10             **REDIRECT EXAMINATION**

11  BY MR. MEHOCHKO:

12  Q.  Sergeant Thulen, I want to make sure the

13  record's clear on the dog sniff.  Your testimony

14  here today is that there is nothing in your report

15  to indicate whether the trunk was open or closed,

16  is that correct, when the dog sniff was done?

17  A.  That's correct.

18  Q.  But you -- your testimony is that you find it

19  unlikely that you would have done an external sniff

20  of the vehicle with the trunk open?

21  A.  Yes.

22  Q.  Can you explain why, why you say that?

23  A.  Sure.  The purpose of doing a K-9 sniff, when

24  you have consent to search the vehicle or any other

25  authorized reason to search the vehicle, is if the

consent gets revoked, situation changes, you have
another reason to search the vehicle, if possible.

    If the trunk's open, and the dog indicates on
the interior of the vehicle, I don't know if that
defeats the purpose of the K-9 alert or not, but
generally K-9 sniffs are performed with the vehicle
closed, including the windows closed.

    There is a -- you know, there's always a
possibility that the K-9 would jump into the open
trunk, and it seems like you're inviting a legal
challenge at that point.  I don't know.

Q.  Was Rocco used later to conduct a sniff --

A.  Yes.

Q.  -- on the currency?

A.  Yes.

Q.  Tell us about that.

    MR. TASEFF:  Objection.  That is outside the
scope of this motion hearing.  Again,
after-acquired information.  If the dog alerted to
the bags at the police department long after the
man is handcuffed and arrested, it's of no value to
the Court's determination of probable cause.

    MR. MEHOCHKO:  Mr. Taseff opened this door,
Judge, by apparently attacking the reliability of
this dog.  The fact of the matter is, it is

1  relevant if he's trying to say that somehow the

2  fact that the dog did not alert at this particular

3  point is significant.  I think it's relevant and,

4  to complete the record, it is appropriate to note

5  that the dog did have another opportunity to do a

6  search without the currency being contained inside

7  the vehicle.

8      MR. TASEFF:  Judge, I'm not attacking the

9  veracity of the dog.  I'm supporting it.  The dog

10  was used and couldn't alert; thus, they had no

11  probable cause on that factor.  What they found out

12  two hours later is immaterial to this motion.

13      THE COURT:  At what point was the later sniff?

14      MR. MEHOCHKO:  I think it was done back at

15  District 7, Your Honor, hours later.  No question

16  it's probably four hours, five hours later.

17      THE COURT:  I don't see the dog's reliability

18  is at issue here so the objection's sustained.

19      MR. MEHOCHKO:  I agree that the dog search has

20  no significance, but Mr. Taseff seemed to feel the

21  need to cover it.

22  BY MR. MEHOCHKO:

23  Q.  Trooper Thulen, you testified you don't recall

24  specifically how you notified McFall, but you did

25  notify him in some way or another?

1  A.  I did, and I'm confident of that.

2  Q.  Okay.  And I believe your testimony was that

3  you notified him after you noticed that it was a

4  third-party vehicle, the defendant didn't know his

5  address in New York and didn't know the last name

6  of his passenger, correct?

7  A.  That's correct.

8  Q.  Okay.  During the time that you were talking

9  to the defendant and having this conversation with

10  him, did you ever stop and get on your cell phone

11  and make a telephone call to anybody?

12  A.  No.

13  Q.  Did you ever stop and get on your radio, make

14  a radio call to somebody?

15  A.  If I did, it would be very brief, but I very

16  likely used the mobile data computer because it's

17  quick, it's efficient, and it doesn't interrupt my

18  conversation with the person or persons I'm talking

19  to.

20  Q.  You testified -- as His Honor has already

21  asked you -- there were three things that led you

22  to leave your position on the interstate and follow

23  up on with Mr. Celeya, correct?  You said one of

24  those was the manner in which the vehicle was

25  driven?

1  A.   Yes.

2  Q.   What specifically do you mean by that?  What,

3  what about that was it that caught your attention?

4  A.   The vehicle was driven in a manner that was at

5  or under the speed limit, in a -- in a cautious

6  kind of manner, being careful not to commit

7  violations.  I believe he carefully used his turn

8  signal.  It just -- on I-80 almost every vehicle is

9  committing some sort of violation.  Almost every

10  one.  And it -- it's almost unusual to see one that

11  isn't committing even a minor traffic violation.

12  Q.   And you discussed the demeanor of the driver

13  as another reason?

14  A.   Yes.

15  Q.   The rigid appearance?

16  A.   Yes.  The rigid appearance, according to my

17  training and, more importantly, my experience is

18  unusual.  The, the -- I've seen it so many times

19  where the driver is staring straight ahead in a --

20  I can best describe it as an unblinking, staring

21  ahead, thousand-yard stare, gripping the steering

22  while tightly at 10 and 2.  It's significant in my

23  mind.  By itself it may mean nothing.

24  Q.   When you say "it's significant," I mean, is it

25  different from a reaction you typically see?

1  A.   Yes.   It's unusual.

2  Q.   How?   How is it different from your normal,

3  everyday motorist?

4  A.   Your normal, everyday motorist usually appears

5  more relaxed.  Almost all of them look at the squad

6  car in the median.  Whether they know it's a squad

7  car or not, there's a vehicle parked in the median,

8  and usually people will at least glance at it, look

9  at it.

10      They don't have -- they don't have that "I'm

11 going to stare straight ahead, and if I don't see

12 you, you won't see me" look on their face.

13 Q.   And then finally, you talked about a newly

14 issued registration.  Why was that significant?

15 Newly issued license plate, I think you said.

16 A.   Sure.  At that time New York had fairly

17 recently -- and I don't know exactly when, but that

18 was fairly early in the new style New York

19 registration.  Whenever states change their

20 registration plates, it's of significance to me

21 because I want to be able to recognize registration

22 plates, as well as for a while when states change

23 their registration plates, you can get a pretty

24 good idea if license plates have been applied to

25 that vehicle recently.

1        The license plates on our vehicles in Illinois

2   tend to be on the car for years and years.  We tend

3   to stick with the same style of registration.

4        When that style of registration changes, you

5   can tell when a vehicle has -- for a short amount

6   of time, you can tell when a vehicle has been

7   fairly recently acquired by the temporary

8   registration on it.

9   Q.   What's the significance of that to you, from a

10  drug-trafficking standpoint?

11  A.   Sure.  According to my training and

12  experience, one of the commonalities of many

13  smuggling incidents, incidents involving traveling

14  criminals, traveling felons is that they're often

15  using vehicles that were recently acquired.  Of

16  significance is a recently acquired vehicle that

17  has third-party ownership.  That means somebody

18  else has purchased and registered this vehicle and

19  immediately or soon after loaned it to somebody

20  else.  Vehicles involved in these kind of incidents

21  tend to get handed off from driver to driver, from

22  smuggler to smuggler.

23       It's very similar to the one key on the key

24  ring, where the vehicle gets handed off from person

25  to person to make these trips involving criminal

1  activity, and that vehicle tends to get used by

2  numerous people to make these transportation phase

3  of the crime runs.

4  Q.  I want to ask you some questions about -- it

5  was unclear to me.  Mr. Taseff was asking you

6  questions about -- do you remember he showed you

7  the overhead of the ramp and the highway?

8  A.  Yes.

9  Q.  Do you recall that, Defendant's Exhibit 2?

10  Just so the record is clear, Defendant's

11  Exhibit 2 contained the notation 100 East Bestor,

12  which is the address of the Subway restaurant?

13  A.  I don't believe that's correct now.

14  Q.  Okay.  But the location indicated on the

15  exhibit was not the location where the stop took

16  place?

17  A.  That's correct.  I believe that I indicated

18  the wrong address on my report when I looked it up.

19  Q.  Okay.

20  A.  It's probably the old Subway restaurant.

21  Q.  So, the overhead indicating the address may be

22  correct, but that's not the location where this

23  took place.  It took place at the Subway?

24  A.  That's correct.

25  Q.  Okay.

1  A.   The current Subway restaurant.

2  Q.   Okay.  He asked you some questions about

3  slowing down for the entrance ramp.  Do you recall

4  those?

5  A.   I do.

6  Q.   Okay.  When the defendant passed you on the

7  highway, did he maintain his speed, or did he slow

8  down?

9  A.   He may have slowed slightly.  He was already

10 at or below the speed limit, and he, he -- he very

11 well may have slowed down even more below the speed

12 limit.  This, this is part of -- subtle reaction to

13 my presence as a law enforcement officer is

14 something that I'm pretty in tune with, even a

15 subtle reduction in speed.

16 Q.   Okay.  And then finally, when you and Trooper

17 McFall asked the defendant whether you can search

18 his vehicle and he gave you consent to search, do

19 you recall that?

20 A.   Yes.

21 Q.   And then you told him you don't have to

22 consent; is that correct?

23 A.   That's correct.

24 Q.   Okay.  Is that at the point when he asked you

25 whether or not they could go in the Subway and eat?

1  A.   Yes.

2  Q.   Okay.  And what was it that you told him?  Did

3  you tell him that he had to go to the Subway or

4  that he was free to go to the Subway?

5  A.   No, I told him -- I didn't tell him that he

6  had to go into Subway.  It appeared that they were

7  headed for the Subway restaurant when I initiated

8  contact with Mr. Celeya.  So, one of the things

9  that I told him was, You're free to go.  If you

10 guys want to go in and eat, feel free to do it.  Go

11 in and eat.  We'll get our business done out here.

12 You can see what's going on out here.

13      It's -- I don't remember what the weather was

14 that day, but certainly -- my point in telling him

15 that was that we weren't limiting his, his

16 movements, whether he could come or go or what he

17 could do.

18 Q.   Fair enough.  And as far as his questions

19 about the ledger in the bags in the two photos, one

20 photo was taken from farther away; the other photo

21 was taken closer to the bag?

22 A.   Yes.

23 Q.   It's the closer photo where you can actually

24 see the notations?

25 A.   That's correct.

1  Q.   But that was before the bag was even opened,
2  correct?
3  A.   Both were taken before the bag was opened,
4  yes.
5  Q.   So, the closer-in photo is basically just a
6  zoom of what the previous photo showed?
7  A.   Yes.
8  Q.   Okay.
9       MR. MEHOCHKO:   Those are my questions, Judge.
10                **RECROSS-EXAMINATION**
11  BY MR. TASEFF:
12  Q.   Based upon your recollection, you would have
13  used your mobile data terminal to effect these
14  communications with your Dispatch and fellow
15  officers, correct?
16  A.   It's very likely, and that is my custom and my
17  habit.
18  Q.   Now, the mobile data terminal's basically a
19  laptop computer that's mounted next to you in the
20  driver's seat so you can make these computations
21  and requests on a key pad, right?
22  A.   Yes.
23  Q.   Like a laptop computer in your squad car,
24  correct?
25  A.   That is correct.

1    Q.   And the mobile data terminal will allow you to
2    do a license plate or registration check, correct?
3    A.   That is correct.
4    Q.   And you've identified this recency of
5    registration as one of the three issues that
6    prompted your following the car, correct?
7    A.   That is correct.
8    Q.   But you never used your mobile data terminal
9    to run a check of that vehicle's registration
10   before handcuffing Mr. Celeya and putting him in
11   your squad car, correct?
12   A.   I don't know, but that is -- that is -- that
13   is possible.
14   Q.   Indeed, there is nothing -- there is
15   absolutely nothing in your report that would
16   indicate that it was, correct?
17   A.   Notating when I made a registration check
18   wouldn't jump out as being significant at the time
19   I wrote the report.
20   Q.   But that's an important detail when the
21   purpose of your stop -- one of the three -- is
22   questions regarding recency of registration.  All
23   you had to do was run the plate to confirm or
24   dispel that suspicion, correct?
25   A.   I, I think I had already confirmed that

1  suspicion in my mind that it had been recently

2  registered.

3  Q.  No.  You found out about Albert Jones,

4  correct, and then later at the police department

5  found the registration in the car, correct?  Isn't

6  that true?

7  A.  I'm not sure what your question is.  Please,

8  if you could repeat it, I'll answer it.

9  Q.  You did not do an MDT request of that plate

10 and registration at any time prior to arresting

11 Mr. Celeya?

12 A.  It's possible.  I don't know.

13      MR. TASEFF:  Thank you.  No further questions.

14      THE COURT:  Anything?

15              **FURTHER REDIRECT EXAMINATION**

16 BY MR. MEHOCHKO:

17 Q.  Sergeant, Mr. Taseff asked you a couple times

18 now about the purpose of your stop.  Did you make a

19 stop in this case?

20 A.  No, I entered into a voluntary contact without

21 detention of Mr. Celeya.

22 Q.  This was not a traffic stop?

23 A.  This was not a traffic stop.

24      MR. MEHOCHKO:  Fair enough.

25              **FURTHER RECROSS-EXAMINATION**

1 **BY MR. TASEFF:**

2 Q.  At your request, two other state troopers

3 joined you, one of them with a drug-detecting K-9,

4 correct?

5 A.  Oh, that's true.

6     MR. TASEFF:  No further questions.

7     THE COURT:  Thank you.  You may step down.

8 Thank you.

9     Your next witness.

10     MR. MEHOCHKO:  Your Honor, I have Special

11 Agent Clark here to testify about the interview.

12 In speaking with Mr. Taseff prior to the hearing, I

13 don't know that that testimony is going to be

14 necessary.  As I understand it, we're not really

15 arguing about whether or not the defendant was

16 properly Mirandized.  I want to make sure that I'm

17 clear on that; I don't want to misrepresent

18 Mr. Taseff's position.  But I think what we talked

19 about doing is entering the report in as an exhibit

20 for purposes of the content for the venue portion

21 of the motion.

22     THE COURT:  Mr. Taseff?

23     MR. TASEFF:  If I may have just one moment

24 with Mr. Mehochko?

25     (A pause was had in the record.)

1      MR. TASEFF:  Judge, what we're going to do is

2  we're going to have a joint exhibit or proffer with

3  respect to the interrogation portion of this, and

4  we would be offering the written report of Special

5  Agent John Clark, Illinois State Police, which is a

6  narrative of the post-arrest interview of

7  Mr. Celeya at Geneseo Police Department on

8  September 26th, 2010.  And accompanying the -- that

9  interview is a *Miranda* waiver form that's signed by

10  Mr. Celeya at 1:42 p.m. on September 26th, 2010,

11  and witnessed by Agent Clark and Agent Chamira

12  or --

13      MR. MEHOCHKO:  Chavira.

14      MR. TASEFF:  Chavira, C-h-a-v-i-r-a.  And then

15  finally there's a consent to search that was

16  executed at 2:37 p.m.

17      We'd make those exhibits as a joint -- it

18  would be Government Discovery 23 through 28

19  inclusive, and we'll offer this then as to the

20  content of the post-arrest statement so that the

21  Court can then consider that in relation to our

22  motion to dismiss on the venue question.

23      THE CLERK:  23 through 28?

24      MR. TASEFF:  Yes, Government Bates Stamp

25  Number 23 through 28.  So, this would be Government

1  Exhibit --

2       MR. MEHOCHKO:  Oh, let's call it 12.

3       MR. TASEFF:  Number 12 is the Clark report.

4       MR. MEHOCHKO:  I've got a sticker here.

5       THE COURT:  Okay.  Mr. Mehochko, anything else

6  on that?

7       MR. MEHOCHKO:  No, Judge, with the

8  understanding that the only issue here that

9  Mr. Taseff's arguing -- I just want to make sure

10 that I've got the foundation that I need.  But the

11 only issue here is whether or not there was a

12 legitimate arrest, whether the defendant was

13 legitimately taken into custody, and that he's not

14 pursuing a *Miranda* issue.  He appeared to raise it

15 in his motion to suppress, but I understand that is

16 really not the issue here today?

17      MR. TASEFF:  No, Judge, this entire motion is

18 based on *Brown vs. Illinois*.  We're alleging that

19 Mr. Celeya was arrested without probable cause, was

20 then Mirandized later at the police department and

21 gave the post-arrest statement.  Giving the *Miranda*

22 does not cure the Fourth Amendment violation that

23 we claim occurred at the Subway shop when he was

24 cuffed and placed into the car.

25      THE COURT:  All right.  Okay.  Any other --

1   are there any other witnesses?

2       MR. MEHOCHKO:  Not from the government, Your

3   Honor.  No.

4       THE COURT:  Anything from the defense?

5       MR. TASEFF:  No.

6       THE COURT:  Do you want to argue this?

7       MR. TASEFF:  Could we have five minutes,

8   Judge?  I'm a little parched.

9       THE COURT:  We sure can.  Let's take five.

10      THE CLERK:  Court is in recess.

11      (Recess at 11:41 to 11:46 a.m.)

12      THE COURT:  Argument?

13      MR. TASEFF:  Judge, before we begin, I want to

14  make sure that Defense Exhibit 1, we would move for

15  its introduction.  It's a map of Interstate 80

16  coast to coast, the states that the highway

17  traverses through.

18      And then Exhibit 2 is a black-and-white

19  photograph -- aerial photograph of the exhibit we

20  were using throughout Trooper Thulen's testimony.

21      And the government has offered, I believe,

22  Exhibits 1 through 11.

23      THE COURT:  Mr. Mehochko, anything on those?

24      MR. MEHOCHKO:  No objection, Your Honor.

25      THE COURT:  All right.  They're admitted.

1        MR. TASEFF:  First things first.  What we are

2   talking about here is probable cause for arrest,

3   facts and data which would lead a reasonable person

4   to believe that a specific crime was committed by

5   the person to be arrested.  What began, according

6   to the government, as a consensual encounter has

7   transformed in a matter of minutes into three state

8   police troopers summoning these two individuals out

9   of a Subway restaurant at which time they were

10  immediately handcuffed, placed in separate squad

11  cars with the intent to transport those two to

12  Geneseo Police Department which, I believe the

13  trooper said, was a mile and a half or two miles

14  from the scene of this restaurant.

15       Those facts, that action against those two

16  suspects is clearly -- in fact, it's indisputably a

17  full custodial arrest.  At that point in this

18  encounter, I don't know of any case from any

19  jurisdiction that would characterize that as a

20  *Terry* stop for investigative purposes when you're

21  cuffed, in a squad car, and you're going some two

22  miles away.

23       THE COURT:  Well, I don't think that's in

24  dispute, is it?

25       MR. TASEFF:  So, I don't think there's any

1  dispute here, notwithstanding --

2      THE COURT:  Once they're cuffed and they're in

3  custody --

4      MR. TASEFF:  -- the portion of the

5  government's response about -- the government

6  responding reasonable suspicion maybe earlier on in

7  the case, although I assume they're going to take

8  the view it was purely consensual until the cuffs

9  were placed.  But be that as it may, Mr. Mehochko

10  will argue it's the government's theory.

11      Ours is there's a full custodial arrest, and

12  at that point what probable cause existed at that

13  moment when the cuffs are on that Ramon Celeya

14  committed a specific crime.

15      The cases are clear from this circuit.  In

16  fact, the Seventh Circuit has said time and time

17  and time again that the existence of any sum of

18  money or the method of storing it standing alone is

19  not enough to establish probable cause.  And as one

20  of the judges noted, "To date" -- quote, "To date

21  this Court has not held that currency is

22  contraband."  Further, the courts have said, No

23  court yet has held that the presence of a large sum

24  of cash is sufficient, standing alone, to establish

25  probable cause for arrest (sic).

1    The government, relying upon the discovery of
2  these four bags containing cash which, by my
3  recollection, they were in $20 denominations, some
4  50s and 100s with rubber bands -- because not
5  everybody works in banks and has bank wrappers --
6  in a heat-sealed bag that, by all appearances,
7  could come from some infomercial on television.
8    THE COURT:  What are the cases you're citing
9  about the existence of any sum of money standing
10 alone to establish probable cause?
11   MR. TASEFF:  Paragraph two of the motion to
12 suppress, *U.S. vs. $506,231 in U.S. Currency*, 125
13 F3d. 442, specifically page 452.  *U.S. vs. $5,000
14 in U.S. Currency*, 40 F3d. 846, 850.  16 F3d. 1051,
15 specifically page 1072.  957 F2d. 280.  They're all
16 listed in paragraph two of our motion.
17   THE COURT:  I got it.
18   MR. TASEFF:  So that, coupled with what the
19 officer perceives as suspicious, inconsistent
20 statements, okay, throw that into the probable
21 cause calculus as well.  Maybe suspicious, maybe
22 unusual, but significantly -- unlike other cases
23 where the dog does the walk-around and alerts, the
24 Supreme Court's ruled in those cases -- *Caballes*
25 and others -- that a dog alert is probable cause to

1    believe the vehicle contains contraband.  And how

2    many cases do we see in highway interdiction cases

3    where the dog alert is basically the authority to

4    search the car in total?

5         Here, the trained dog that wins rave awards

6    from both of these troopers did not alert on the

7    vehicle.  There's no criminal history information.

8    How many times do we see a case where the police

9    encounter a motorist and they run a registration;

10   it's expired.  They run a registration; it's in

11   somebody else's name.  Or a rental car case, and

12   there's a non-authorized driver behind the wheel.

13   How many of these cases do we see where there's an

14   encounter and there's a suspicious odor emanating

15   from the vehicle, or there's a large amount of

16   paper wrappings and things that are strewn in the

17   passenger compartment, alerting the officer's

18   suspicion?  But in almost every case I've seen

19   where there are these large seizures of currency,

20   there is also the probable cause to believe that

21   the vehicle has contraband.  And all of that is

22   absent from this case, Judge.

23        THE COURT:  Okay.  Let me understand your --

24   the issue, I think, from your point then.  You're

25   not contesting or raising the issue that the

1 consent -- that it was not -- there was no

2 consent --

3     MR. TASEFF:  We are conceding --

4     THE COURT:  -- because the record doesn't have

5 any ability to communicate that.

6     MR. TASEFF:  This is not an instance where

7 we're saying --

8     THE COURT:  All right.  You're saying no

9 probable cause to search or to make an arrest based

10 upon the search that revealed large sums of money.

11     MR. TASEFF:  What we're saying is this, so the

12 record reflects exactly our point:  We're saying

13 that up to that time when the cuffs are placed and

14 they're in the squad car, the totality of the

15 circumstances did not arise to probable cause for

16 arrest, period.

17     The case relied upon by the government,

18 *Suarez*, that's a case where a woman attempts to

19 smuggle more than $10,000 in currency through

20 Customs at O'Hare.  It's a federal crime for one to

21 pass through Customs with more than 10 grand in

22 currency without declaring it, so the discovery of

23 the large amount of currency and the false

24 declaration was ipso facto probable cause to arrest

25 for that specific Customs violation.  And that's

why the court in the Seventh Circuit said a large
amount of money alone isn't P.C.  It is in Customs
where you're affirmatively stating under oath on
your Customs paper, "I'm passing through without
10,000."  You're affirmatively lying about the
existence of that amount in violation of federal
law.

Any citizen with packages of cash in his car
from whatever transaction -- lawful or illicit --
the courts have said that fact alone is not
probable cause to arrest.  Other factors may give
rise to probable cause for seizure of the currency
for administrative or initial forfeiture, but to
arrest the motorist based upon suspicions aroused
by cash plus inconsistent statements is not the
law.

And what I find very troubling -- again, I
have -- they are here in the courtroom so I'll say
it in the Court's presence.  I have utmost respect
for these men.  We do cases with them.  Probably
for the last 15 years we've battled on these cases.
But I find it troubling when it's the trooper's
experience -- Trooper Thulen says on one hand most
motorists on I-80 who pass us are violating the law
in some respect.  And as the courts have said,

1  that's every right for the trooper then to become
2  suspicious and surveil and stop or investigate.
3  But in Trooper Thulen's mind, it's equally
4  suspicious if the guy's doing everything right.
5  He's not speeding; he's slowing down; he's
6  activated his turn signal.  I mean, what is a
7  citizen to do?
8      Oh, he's nervous; he's rigid.  Just last night
9  going home, I'm traveling up Germantown hill ten
10  miles over the speed limit, and there's one of the
11  trooper's finest sitting there who gave me a pass.
12  Quite frankly, I didn't look at that trooper
13  because I didn't want him to see me.  If he knew I
14  was a public defender, he'd stop me for sure -- a
15  joke, a poor one at that.
16      But what I'm saying here, Judge, is that we're
17  not saying coerced consent and everything else.
18  This case is remarkably simple in that it all comes
19  down to probable cause to arrest at the time the
20  seizure occurs.  What they found out hours later at
21  the police department through continued
22  investigation while the man had already been in
23  custody does not save and bootstrap an illegal
24  arrest into something that is lawful.
25      So, they jumped the gun here, and I think it's

1   pretty apparent that they -- they went forward to

2   arrest, detain, transport to the police department

3   and then do their investigation.  And that's

4   turning the Fourth Amendment on its head.

5        So, even though Agent Clark properly

6   Mirandizes Ramon Celeya some four hours later and

7   obtains a statement, the content of which is in

8   that report -- and for future reference, Judge,

9   that particular exhibit, I believe, it's

10  People's 11, post-arrest statement --

11       MR. MEHOCHKO:  Government 12.

12       MR. TASEFF:  Government.  Government's 11, is

13  it?

14       MR. MEHOCHKO:  12.

15       MR. TASEFF:  12.  I would suggest we put that

16  under seal.  There's a lot of information contained

17  in that report that some people from some parts of

18  this country would be very interested in knowing

19  and could put Mr. Celeya at risk.  So, I'm -- we

20  offer that as a joint exhibit for purposes of the

21  content of the statement that was made following

22  the arrest as it then flows into the venue argument

23  that we'll make shortly.

24       But I'd ask that that matter -- that that

25  particular exhibit be placed under seal so that no

one can snoop through a court file and see what is
apparently some very sensitive information there,
all of that acquired some four hours after the
cuffs were placed and the gentleman was placed in
the squad car.  It's, it's not enough to save what
is otherwise an unlawful arrest.

So, suspicions alone don't cut it.  And with
nothing further to corroborate those suspicions, as
we normally see in cases of this nature -- the
positive alert, the prior criminal history, the
presence of contraband in plain view -- those
things don't make possession of cash illegal, at
least subject to arrest.

And the final point, this ledger or whatever
that's been bandied about, a piece of paper that is
visible to the naked eye in the heat-sealed bag has
four to five numerical figures and that's it.  The
photograph that shows the full content of the
ledger after the bag was opened, after Mr. Celeya
was in custody, all of that, Your Honor, was
gathered hours after the seizure had already
occurred.

So, for those reasons, these troopers coming
upon these bags of cash in those suitcases and with
the information that they possessed, however

1 suspicious the trooper himself may have believed it

2 to be, does not amount to probable cause for

3 arresting Mr. Celeya for any state, federal or

4 local crime because -- not just my opinion, but the

5 Seventh Circuit, the Sixth Circuit and hosts of

6 decisions from circuits all over the country hold

7 that cash alone and the manner in which it's stored

8 is not P.C. for arrest.

9        Thank you.

10       THE COURT:  Thank you.

11       Mr. Mehochko?  First, do you agree with that

12 statement?  We start with the premise that cash

13 standing alone is not probable cause?

14       MR. MEHOCHKO:  Sure.  I absolutely do, if --

15 and I think the law's pretty clear on that.  If all

16 we had here was a bundle of cash sitting on the

17 side of the seat and nothing more, we wouldn't have

18 probable cause, but we've got a whole lot more than

19 that.  A whole lot more than that.

20       And I've recounted these factors, and Trooper

21 Thulen discussed them in great detail here today.

22 But as Trooper Thulen -- Sergeant Thulen, I should

23 say, said what initially drew his attention was the

24 way that the defendant was driving, the fact that

25 he didn't appear to react to him the way that other

1  motorists do, and that newly issued registration

2  plate that was on his vehicle.  That's what drew

3  his attention.

4      But Trooper Thulen -- or Sergeant Thulen --

5  I'll get it right eventually -- said that, I didn't

6  think that that was enough to stop him.  It drew

7  his attention; it made him want to follow up and

8  see what was going on.  And like the outstanding

9  interdiction officer that he is, that's what he

10  did.  He followed up and attempted to make

11  consensual contact with the defendant outside the

12  Subway.  And there's no dispute here that it was a

13  consensual contact.

14      THE COURT:  Okay.  Let me ask you a question

15  here.  Let's take this one step at a time then.

16      MR. MEHOCHKO:  Sure.

17      THE COURT:  So, the three factors that he --

18  that drew his suspicion or his interest standing

19  alone:  Manner in which the car was driving,

20  demeanor of driver, fairly recent registration, he

21  said, was not enough to stop him.

22      MR. MEHOCHKO:  Correct.

23      THE COURT:  All right.  So, those three alone,

24  do you think they qualify as probable cause?

25      MR. MEHOCHKO:  Those three standing alone, no,

1  I don't.

2      THE COURT:  All right.

3      MR. MEHOCHKO:  It's not our position that any

4  one of these factors -- if we had a drug dog

5  hitting on the car, that in and of itself is

6  probable cause.  That makes it much easier.

7      What we're talking about is the totality of

8  the circumstances.

9      THE COURT:  These three factors don't

10  establish probable cause, but he has an interest

11  now.  He wants to have a consensual encounter with

12  him --

13      MR. MEHOCHKO:  Correct.

14      THE COURT:  -- which he does.

15      MR. MEHOCHKO:  Which he does.

16      THE COURT:  All right.  Go ahead.

17      MR. MEHOCHKO:  So, he has that encounter.  He

18  learns a lot of things during the encounter that

19  raises --

20      THE COURT:  What does he learn that raises his

21  suspicion?

22      MR. MEHOCHKO:  He learns the defendant -- I've

23  set these out on page 10, 11 and 12 of my response.

24      First of all -- well, first of all, there's --

25  there are those three things that drew his

1  attention, and I'm not saying that we should

2  discount those.  Those go in the analysis.

3      THE COURT:  I understand.

4      MR. MEHOCHKO:  But in addition to those -- in

5  addition to those, we've got the defendant exiting

6  the interstate.  Then we've got the defendant and

7  his passenger -- he finds out that they're engaged

8  in cross-country travel, consistent with what he

9  described as drug courier routes going from, in

10  this case, from east to west.  The identification

11  documents, both of those individuals indicate that

12  they're living in Arizona, which is known as a drug

13  source state, as he testified.  The Southwest is a

14  drug source area.

15      MR. TASEFF:  Judge, I believe there was no --

16      THE COURT:  When does he learn something -- I

17  know you're talking about totality here, but at

18  what point does he learn something that makes him

19  think something illegal is going on?

20      MR. MEHOCHKO:  I think it -- well --

21      THE COURT:  All right.  We've got an

22  out-of-state identification.  We've got an

23  out-of-state registration.  You've got traveling

24  the interstate that drug couriers travel.  Yeah, he

25  believed him when he said there were no drugs, no

1   heroin, no cocaine, no meth, no pot; didn't believe
2   him when he asked about the money, but we've
3   established the money isn't illegal.
4       MR. MEHOCHKO:  Standing alone it's not.
5       THE COURT:  Okay.
6       MR. MEHOCHKO:  Lying about it is significant.
7   It's very significant.
8       But getting back here, at what point did
9   Trooper Thulen suspect that there was something
10  illegal going on?  I think his testimony was he
11  called McFall after he learned the defendant's
12  driving a third-party vehicle, lives in -- says he
13  lives in New York but doesn't know his address.
14  And I think the last thing that he said tipped him
15  off or at that point triggered him calling McFall
16  was that he said he had been long-time friends with
17  his passenger but didn't know his last name.  Those
18  are things that, I would submit to the Court here
19  -- I mean, we can see from the encounter here as
20  things go on, they get more and more and more
21  suspicious.  He knows they've got all this
22  background; where they're from; the fact that the
23  registered owner is a third party, which he said he
24  thought was very significant to him; loaning this
25  vehicle to the defendant for a cross-country trip

1   from New York to Omaha, according to the defendant;

2   again, said he didn't know -- had been long-time

3   friends with the defendant but didn't know the

4   passenger -- but didn't know his last name.  That's

5   pretty strange.

6        The single ignition key, as Trooper Thulen

7   said, is something that he's seen time and time

8   again in courier cases and is significant, along

9   with the newly issued registration, with the manner

10  in which these load vehicles are acquired and then

11  handed off to a courier.

12       And then this indefinite travel issue:  The

13  fact that the defendant says he's going to Omaha

14  but doesn't know exactly where he's going; the

15  grandmother who lives near the zoo, but he doesn't

16  know the address, he doesn't know where.  Again,

17  consistent with security measures used by drug

18  traffickers.  They don't give these people an

19  address of the destination house for the very

20  reason that if they are stopped, those agents who

21  do the follow-up investigation can't simply get in

22  the car and drive the vehicle to the destination.

23  The courier is an integral part of the operation,

24  and that's the reason for that.

25       There's the questions about the money.

1  Trooper -- Sergeant Thulen clearly had some

2  suspicions, based on the answers, that there was

3  going to be money in the vehicle, but the defendant

4  denied it multiple times; said no, there's no large

5  amount of money in the vehicle.  Gives a very, very

6  strange answer to that.  There's the escalating

7  nervousness during the encounter.  And then the

8  fact that they do find this money heat-sealed and

9  packaged in the manner that Trooper Thulen

10  testified is extremely consistent with the way drug

11  courier -- drug proceeds are transported cross

12  country.  They're packaged up in rubber bands.

13      There are ledgers included in those FoodSaver

14  bags.  And most importantly, they're in those

15  heat-sealed bags to defeat K-9s, to keep the odor

16  trapped in the bag which apparently in this case

17  worked because the dog did not alert on the

18  vehicle.

19      So, that's extremely significant to Trooper

20  Thulen, based on his training and experience, at

21  least there's certainly some criminal activity

22  here.

23      Coupled with that is the fact that after the

24  defendant's Mirandized and interviewed, he claimed

25  the $40,000 in the bag.  Gives a pretty implausible

1  story about where it came from -- sale of cars.  No

2  explanation for why car proceeds need to be

3  rubber-banded and heat-sealed to defeat a dog.  But

4  nobody's claiming the money in the other suitcase.

5  So, you've got four bags of money heat-sealed in

6  these FoodSaver bags in these suitcases.  Two of

7  them are claimed by one of the passengers; two of

8  them nobody wants to claim.

9      At that point, what's a trooper to do?  What

10  do we -- what do we think is going on here?  Based

11  on Trooper Thulen's training and experience, his

12  extensive drug interdiction, this has all the

13  hallmarks of a drug run.  It has all the hallmarks

14  of an east-to-west currency trade which we, of

15  course, later found out is exactly what it was.

16      So, this isn't just money with nothing else.

17  There are a lot of other factors that the Court can

18  take into account in the totality of the

19  circumstances that do establish there's probable

20  cause to believe these are drug proceeds and the

21  defendant was the one engaged in transporting them.

22      I cited the *Suarez* case, and I think it's

23  important to remember the issue in that case was

24  not whether or not there was probable cause for the

25  criminal violations.  As Mr. Taseff said, federal

1  crime -- it's ipso facto of a federal crime to
2  transport $10,000 out of the country.  That wasn't
3  the issue in *Suarez*.  That wasn't the issue that
4  the court analyzed in that case.  What the court
5  analyzed in that case and what the court
6  distinguished, the $506,000 currency case that
7  Mr. Taseff cites as well as the other cases that
8  say money standing alone isn't enough.  What the
9  *Suarez* court said is money standing alone isn't
10  enough, but money plus lies is enough.  Money plus
11  lies about the source of the funds leads one to
12  believe that they are the source of illegal
13  proceeds -- illegal activity, and it is reasonable
14  to believe that there is being a crime committed,
15  that they are illegal proceeds.
16      The issue in *Suarez* was the application of the
17  sentencing enhancement that applies to someone who
18  knew or believed that the funds were proceeds of or
19  intended to promote unlawful activity.  What the
20  *Suarez* court has said is money plus lies does lead
21  a reasonable person to conclude that there is
22  unlawful activity going on.  That's what we have
23  here, Judge.  Money plus lies plus a number of
24  other factors that all point straight toward drug
25  trafficking.

1       So, for those reasons, Your Honor, I would

2  submit there was probable cause for the troopers to

3  conclude that Mr. Celeya, the defendant, was

4  engaged in criminal activity, was transporting drug

5  proceeds, and they did have probable cause to

6  arrest him.  To the extent -- I think it's very

7  clear; I don't think it's even a close call there's

8  probable cause to arrest him for that.

9       To the extent that there's any doubt about

10 that, I do think there's a reasonable suspicion

11 argument to be made.  To the extent there's any

12 argument that the totality of the circumstances

13 falls short of the probable cause, there's

14 reasonable suspicion that is then corroborated or

15 ripens into probable cause later on.

16      So, for all those reasons, Judge, we would ask

17 the Court to deny the motion to suppress.  The

18 statements fully justified probable cause to

19 arrest, and there's simply no reason to exclude the

20 statements.  And as I understand it, again, that is

21 the only issue being raised by the defendant.

22      So, for those reasons, we ask the Court to

23 deny the motion.

24      THE COURT:  Thank you.

25      Mr. Taseff?

1      MR. TASEFF:  *Suarez* probable cause, it was a
2  guideline enhancement case.  That's what the court
3  was called upon to look to in the *Suarez* decision,
4  within the context of a guideline application note,
5  an enhancement, in the context further of a
6  currency smuggling case at the Customs border.
7  That's that decision; it's apples and oranges from
8  this.
9      Secondly, I believe -- correct me if I'm wrong
10  -- Mr. Mehochko referenced a statement about whose
11  suitcase was whose as adding further suspicion.
12  That statement occurred only after Celeya was
13  cuffed and in the squad car and soon to be en route
14  to the police department.  So, again, you can't
15  bootstrap stuff.  You can't bootstrap an unlawful
16  arrest with after-acquired information.  So, I
17  respectfully object to the Court's consideration of
18  that statement attributed to Mr. Celeya after he
19  had already been cuffed and was in a squad car and
20  had been given *Miranda* by the trooper when that
21  statement was allegedly uttered.
22      So, for those reasons we respectfully submit
23  there is no probable cause for an arrest on these
24  facts of Ramon Celeya.
25      MR. MEHOCHKO:  If I could just respond to

1  that, Judge?

2      THE COURT:  Go ahead.

3      MR. MEHOCHKO:  To the extent -- again, my

4  position is there's probable cause before the

5  officers put handcuffs on the defendant.

6      To the extent that Mr. Taseff is arguing -- or

7  the defendant's arguing that the statement that he

8  made -- that the post-*Miranda* statement he made

9  after being secured in handcuffs can't be

10  considered, it certainly can.  The mere application

11  of handcuffs doesn't convert a reasonable suspicion

12  or a *Terry* stop into a probable cause arrest.  The

13  cases are very clear on that.  If the officers are

14  reasonably following up on their suspicions --

15  their reasonable suspicions, they have the ability

16  to secure someone in handcuffs.  That statement was

17  made very, very shortly after the defendant was

18  handcuffed in the back of the car, prior to being

19  transported to the police department, prior to any

20  of the other things that happened at the police

21  department.

22      So, to the extent that Mr. Taseff's trying to

23  carve that statement out, that's simply not the

24  law.  The law is that they are entitled to conduct

25  reasonable suspicion follow-up.  The fact that the

person's handcuffed does not convert a reasonable
suspicion of detention or a *Terry* type situation
into a full-blown arrest.  The Court can look at
all the factors that are involved in that very,
very brief after the -- after the cuffs are applied
and the *Miranda* statements were given and then they
get even more outrageous to account for where the
money came from.

So my position's clear, there was probable
cause before they ever put handcuffs on him.

To the extent that the Court thinks otherwise,
the Court absolutely can consider that post-*Miranda*
statement in the back of the squad car towards the
probable cause analysis.  And to the extent that
there's any issue about that, the statement the
defendant gave only heightens the probable cause.

So, for those reasons we would ask the Court
to deny the motion.

THE COURT:  Okay.  Go ahead.  Then I'm going
to make comments.

MR. TASEFF:  Handcuffed, squad car, intent of
officer to transport to a police department,
*Miranda* given.  You're not required to give *Miranda*
on a *Terry* stop.  They did it.

THE COURT:  Okay.

1      MR. TASEFF:  That's why that doesn't hold

2  water.

3      THE COURT:  If I disregard the three factors

4  given that the officer said that drew his attention

5  to Mr. Celeya, which I'm -- which I factor but I'm

6  not placing much emphasis on, in my mind it comes

7  down to this:  Clearly the officer, as allowed by

8  law, approached an individual in a public place and

9  engaged in a consensual conversation with him.  The

10 officer was clear to point out that he wanted to

11 ask him a few questions.  He didn't position his

12 car as to block the defendant.  When the other car

13 came, it didn't block the defendant.  He indicated

14 that he didn't have to ask -- or answer any

15 questions.  He indicated he didn't even have to

16 agree to search.  He had indicated to him that he

17 could go into the Subway station, that he was free

18 to go.  So, there's no issue as to the -- as to the

19 consensual nature of this, but I make those

20 findings anyway, even though what Mr. Celeya

21 thought I don't know because there's no record of

22 it.

23     So, getting to that point the question

24 becomes, in addition to the money, what might

25 establish -- not in addition -- what might

1   establish probable cause to support the finding of

2   the large amount of money which would lead then to

3   arrest Mr. Celeya.  And I think there are -- I've

4   identified six.  Standing alone may not amount to

5   anything, but I think under the circumstances --

6   it's a close call, but I do think that probable

7   cause is established.

8        Really the questions about the relationship

9   with the passenger, the testimony from the officer

10  about Mr. Celeya's demeanor becoming more nervous

11  as he's asking questions, the information about a

12  third-party vehicle, the denial of any large

13  amounts of money when that turned out not to be

14  true, with the notes, however, the visible notes

15  with some numbering and the heat-sealed packaging,

16  I think that, in its entirety, would, along with

17  the finding of that amount of money would --

18  creates probable cause.  So, the motion is

19  respectfully denied.

20       MR. TASEFF:  Judge, may I inquire?  Probable

21  cause to arrest for what offense?

22       THE COURT:  Probable cause to believe that he

23  may be involved in drug-trafficking or

24  money-laundering conduct.  That was the point.

25  That was the whole point.  I don't know what else

1  it could be.

2      I think if Mr. -- clearly, in my mind, if

3  Mr. Celeya had -- and I didn't hear from him.  I

4  mean, I don't need -- there's nothing in the record

5  to indicate that he was thinking otherwise, but

6  clearly in my mind the initial interest in stopping

7  him created no probable cause or suspicion, to me.

8      But the conversation was revealing, and he

9  engaged in that conversation, and it's not at

10  issue.  And based upon that conversation and then

11  the finding, I believe probable cause is

12  established.

13      MR. MEHOCHKO:  Thank you, Your Honor.

14      THE COURT:  Do you want to address the motion

15  to dismiss?

16      MR. TASEFF:  Yes, Judge.  I want to offer some

17  exhibits here.  We offer Exhibits 3, 4 and 5.  What

18  we're doing here, based upon the factual predicate

19  that the Court has, we're adopting the Court's

20  orders of July 2, 2012, and August 10, 2012, those

21  being Defense Exhibits 3 and 4 respectively, in the

22  case of *U.S. vs. Pereira*, P-e-r-e-i-r-a, a case

23  that I'm sure the Court is very familiar with.

24      And then we are also adopting and offering as

25  Defense 5 Defendants' -- plural -- Defendants'

1   Joint Response to the Government's Motion to

2   Reconsider filed August 6th, 2012, by both defense

3   counsel for the Pereiras.  We adopt defense

4   counsels' arguments contained in that motion to

5   reconsider and offer three -- these three exhibits

6   in support of our motion to dismiss.  We realize

7   the Court has reconsidered its earlier ruling and

8   has denied the motion to dismiss in the Pereiras'

9   case.

10       We believe that based upon what the Court now

11  knows with respect to the information about this

12  alleged conspiracy that there is no basis for venue

13  whatsoever in the Central District of Illinois

14  merely by this defendant operating a motor vehicle

15  containing that sum of money in the trunk; that

16  that is not an overt act or an act -- an overt act

17  in furtherance of any conspiracy that would have as

18  its purpose any intended effect to commit any crime

19  in this district.  He's not charged with possession

20  with intent; he's not charged with any substantive

21  controlled substance offense.  Given the fact that

22  I-80 cuts across the entire swathe of the

23  continental United States, east to west, we adopt

24  the Court's earlier ruling in *Pereira,* that those

25  contacts with this state are so minimal and so

1    inconsequential as to not amount for a proper venue

2    in this district.

3          So, we do this for purposes of the record and

4    adopt those pleadings so as to prevent multiple

5    briefs and orders that the Court would have to

6    address.

7          THE COURT:  Mr. Mehochko?

8          MR. MEHOCHKO:  Your Honor, the 12th and 7th

9    Circuit law says the venue is proper in any

10   district in which an overt act in furtherance of

11   the conspiracy was committed.  And the report that

12   was entered as a joint exhibit sets out that this

13   defendant clearly is committing an overt act in

14   furtherance of a drug-trafficking conspiracy.  He

15   laid out the drug-trafficking conspiracy.  He

16   admitted that he was transporting the proceeds of

17   that drug trafficking back to Arizona for purposes

18   of conspirators reaping their illegal profits.  So,

19   there's clearly an overt act here when he's

20   transporting that money through this district.

21   Therefore, venue is proper, and we would ask the

22   Court to deny the motion.

23         THE COURT:  Okay.  As previously ruled in the

24   *Pereira* case, I did reconsider the earlier

25   decision.  I believe venue was -- is proper and I

1  believe in this case, under these facts, venue is

2  proper as well.  So, the motion to dismiss as to

3  venue is respectfully denied.

4      Do you want to withdraw this Exhibit 12 or

5  place it under seal?

6      MR. TASEFF:  I'd ask that it be placed under

7  seal, Judge.

8      THE COURT:  Mr. Mehochko?

9      MR. MEHOCHKO:  I think there's some pretty

10 damaging information in there, Judge.

11     THE COURT:  Yes, I agree.

12     MR. MEHOCHKO:  It does pose a risk to the

13 defendant's safety.

14     THE COURT:  But you do have copies, right?

15     MR. TASEFF:  I do not have a copy.  If I may

16 get one before I leave today?

17     THE COURT:  We'll get you a copy.  Then

18 Exhibit 12 will be under seal.

19     Where are we, gentlemen, as far as future

20 dates?

21     MR. TASEFF:  Judge, I would ask that the trial

22 date be set sometime 60 days out.  We have a huge

23 month of October coming up where trials are

24 back-to-back in Rock Island.  And Mr. Celeya is on

25 bond; he's fully compliant.  And we'd ask that

1  sufficient time be given to set a trial date so we

2  can try to work things out.

3      THE COURT:  That's fine.

4      Mr. Mehochko, any objection to that?

5      MR. MEHOCHKO:  No objection.

6      THE COURT:  Is there a trial date set

7  currently?  If there is, you're asking to vacate it

8  and continue it?

9      MR. TASEFF:  Yes.

10     THE COURT:  Okay.  We'll know here in a

11 second.  This computer's down.

12     Do you want to go after the first of the year?

13     MR. MEHOCHKO:  That's fine.  No objection.

14     MR. TASEFF:  That's fine, Judge.

15     THE COURT:  Let's do that.  If something

16 happens ahead of that, reschedule.

17     All right.  These will be in Rock Island:  How

18 is January 11th, 2013, at 1:30 for a pretrial and

19 January 28, 2013, at 9 a.m. for jury trial?

20     MR. TASEFF:  That's fine, Judge.

21     MR. MEHOCHKO:  That's fine, Your Honor.

22     THE COURT:  Court will find in the interest of

23 justice Speedy Trial is tolled until January 28,

24 2013.

25     Okay, gentlemen.  Thank you very much.  We'll

1  be in recess.

2       MR. MEHOCHKO:  Thank you, Judge.

3       THE CLERK:  Court is in recess.

4       (Proceedings concluded at 12:26 p.m.)

5

6

7
                        CERTIFICATE
8

9

10
        I, JENNIFER E. JOHNSON, CSR, RMR, CBC, CRR,
11  certify that the foregoing transcript constitutes a
    true and accurate transcript of the original
12  shorthand notes of the proceedings had at the time
    and place aforesaid before the HONORABLE JAMES E.
13  SHADID, U.S. District Judge.

14

15

16                      s/ Jennifer E. Johnson
                        JENNIFER E. JOHNSON
17                      CSR, RMR, CBC, CRR
                        License #084-003039
18

19

20

21

22

23

24

25